GULF PRODUCTION CO. v. TAYLOR.

No. 677.

Court of Civil Appeals of Texas. Eastland.

April 18, 1930.

Rehearing Denied June 13, 1930.

Sayles & Sayles, of Eastland, and David Proctor, of Houston, for appellant.

McCormick, Bromberg, Leftwich & Carrington, of Dallas, for appellee.

FUNDERBURK, J.

By an instrument in writing dated July 2, 1918, F. W. Taylor, owner of an 80-acre tract of land in Eastland county, conveyed to Gulf Production Company all the oil, gas, and other minerals in said land, or, if not, then seven-eighths of the oil and all the gas and other minerals; together with requisite and proper easements, to exploit the land and produce and prepare for market any minerals found. The instrument, styled "Oil and Gas Lease," recited a cash consideration of $30,000 paid. It vested in the lessee immediately, or, if not, then upon a condition precedent, afterwards discharged, ownership of said minerals in place in the ground, as an interest in the land, by determinable fee title. The provisions of the lease obligating the lessee to pay royalties were as follows:

"If oil shall be found in paying quantities on said premises, the Company shall deliver as royalty to said lessor, free of expense, one-eighth (⅛) part of the oil saved from that produced, such delivery to be made either into tanks supplied by lessor, with connections by lessor provided, or into any pipe line that may be connected with the well; if said Company shall operate so as to save and utilize casinghead gas from said premises, (as it may do if it wishes) then it shall pay as royalty to lessor one-eighth (⅛) of the value calculated at the rate of four (4) cents per thousand (1000) cubic feet, of the casinghead gas so saved, in addition to the royalty to which lessor may be entitled on the oil produced from such oil well, such royalty on casinghead gas accruing in each six months' period counting from the date hereof to be paid within (30) days after expiration of such period; and if any well on said premises shall produce natural gas in 'paying quantities,· and such natural gas be used off of the premises or marketed by said Company, then lessor shall be paid one-eighth of the net proceeds received from the sale of gas at the mouth of the well, such payments to be made quarterly. Any and all such money royalties may be paid to lessor in person or deposited to the latter's credit in said bank mentioned.

"If, as a result of any explorations under this contract, any other minerals than oil or gas shall be found in quantities deemed by the Company to be paying, then it shall have the right to mine for and produce the same, paying to the lessor what, under all the circumstances, may be a reasonable royalty."

Another provision was to the effect that, even prior to the discovery of oil on the land, if a well was drilled on adjacent land within 200 feet of the line, producing as much as 200 barrels of oil per day for thirty consecutive days, lessee was obligated with all reasonable diligence to begin and prosecute the drilling of a well on the land in a faithful effort to find and produce therefrom oil in paying quantities.

The lessee drilled twelve wells on the land, all of which produced only oil and casinghead gas. (Over $400,000 was paid by lessee to the lessor in royalties.) Upon all the casinghead gas utilized by lessee the lessor was paid 4 cents per 1,000 cubic feet, in addition to the royalty paid on oil. Some of the casinghead gas was used for fuel on the lease and some so used off the lease. In 1921 a gasoline plant was located on the land, and out of the casinghead gas produced from this tract, lessee manufactured gasoline which, from February 1, 1925, to March 28, 1929, amounted to the total value of $566,689.70.

This suit was filed September 29, 1928, by F. W. Taylor, lessor, against Gulf Production Company, lessee, and, as shown by the pleadings, evidence, and judgment, there was litigated the sole question of the right of the plaintiff, under the above facts, to recover the value of one-eighth of the gasoline manufactured from casinghead gas produced and saved from said land. The trial court overruled a motion of the defendant for a peremptory instruction in its favor and sustained a motion by plaintiff for a peremptory instruction in his favor. Upon the instructed verdict judgment was rendered for plaintiff against the defendant for $80,314.90 (being one-eighth of the value of the gasoline, plus interest), from which the defendant has appealed.

It is believed that appellant, by its assignments and propositions, presents for the review and determination of this court, the single question which, as above stated, was determined by the trial court adversely to the appellant.

It is proper to consider first whether, with respect to the question presented, there is any such uncertainty or ambiguity in the provisions of the lease as calls for application of the rule contended for by appellee that the provisions of the lease are to be construed most strongly against the lessee and in favor of the lessor. There may be a question, since the decision in Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S. W. 290, 29 A. L. R. 566, holding that ordinary forms of mineral leases are conveyances of the minerals in place as an interest in land, whether the rule contended for should now be held applicable, since as to conveyances the general rule is to the contrary. But it

is unnecessary to determine that question, if the provisions of the lease are plain and free from any uncertainty in meaning.

 It is perfectly clear, from the terms of the lease itself, that, although it includes other minerals with oil and gas, it was made with primary reference to oil and gas. This is indicated by the fact that, while the royalties to be paid on oil and gas were carefully specified, together with the conditions and manner of payment, it was merely provided as to other minerals that the royalty should be such as "under all the circumstances may be a reasonable royalty." Even as between oil and gas the lease sufficiently evidences the fact that oil was primarily the mineral about which the parties were contracting. This is shown by the provision obligating the lessee to drill offset wells only upon condition that oil wells of specified capacities were drilled on adjacent lands, with no mention of gas wells. Also note the further provision, as to an offset well, that the lessee should "begin and prosecute the drilling * * * in a faithful effort to find and produce therefrom *oil* in paying quantities," saying nothing of gas. It is even more certain from the lease itself that, as between the two kinds of gas, "casinghead gas" and "natural gas," the former was regarded as relatively less important than the latter. This is shown by the fact that as to "casinghead gas" it was expressly made optional with the lessee whether it would "save and utilize" it; the provision as to that being expressed "as it may do if it wishes." No such option was affirmatively expressed in regard to "natural gas." But, apart from the terms of the lease, it is a matter of common knowledge that, about July 3, 1918—the date of this lease—oil, as the subject-matter of leases generally in the section where this land is located, was regarded as relatively more important than gas; and casinghead gas, or the gas produced from oil wells, was relatively less important than natural gas or gas from a well producing gas only. It is no less certainly a matter of common knowledge, of which the courts may take judicial knowledge, that, shortly after that time, by reason of the development and increased use of gasoline combustion engines and the discovery of new processes for the manufacture of gasoline from gas, which had previously been manufactured principally from oil, "casinghead gas," by reason of its greater gasoline content, came to have relatively more importance and value generally than natural or dry gas. These things it is our duty to consider, not to aid in determining what is meant by uncertain or ambiguous language, but to prevent any such uncertainty or ambiguity. Read in the light of the surroundings and conditions referred to, we are of opinion that the provisions of the lease, in at least all respects material to the question presented, are so plain and certain as not to require any resort to the rule of strict construction against the lessee and in favor of the lessor, even if that rule would otherwise be applicable—a question which we expressly do not now determine, however simple or difficult it may be.

 Ownership and title to all the oil, gas, and other minerals were, immediately upon execution and delivery of the lease, or, if not, then immediately upon the discovery of any of said minerals in paying quantities, vested in appellant. This statement it is understood appellee does not challenge further than that it may be inconsistent with the claim that there was excepted from the conveyance one-eighth of the oil in the land. If the last-named contention be correct, it will not, in our opinion, be determinative of the question under consideration. A discussion of that point will therefore be reserved until the last.

The lease provides for the delivery or payment of three specified royalties, each upon more or less different conditions or contingencies, and each having reference to differently named substances. (1) As to one such substance denominated "oil," it provides that the lessee "shall deliver * * * free of expenses, one-eighth (⅛) part of the oil saved from that produced, such delivery to be made either in tanks supplied by lessor, with connections by lessor provided, or into any pipeline that may be connected with the well." (2) As to another substance denominated "casinghead gas," it is provided: "If said company shall operate so as to save and utilize casinghead gas from said premises, (as it may do if it wishes) that it shall pay as royalty to the lessor one-eighth (⅛) of the value, calculated at the rate of four (4) cents per thousand (1,000) cubic feet of casinghead gas so saved *in addition to the royalty to which lessor may be entitled on the oil produced from such well.* (Italics ours.) Such royalty on casinghead gas accruing in each six months period, counting from the date hereof, to be paid within thirty (30) days after expiration of such period." (3) The provision with reference to the third named substance was: "If any well on said premises shall produce natural gas in paying quantities and such natural gas be used off the premises or marketed by said company, then lessor shall be paid one-eighth of the net proceeds received from the sale of gas at the mouth of the well, such payments to be made quarterly." As to such of the royalties as were "money royalties," it was provided that same should be paid to lessor in person or deposited to the latter's credit in a named bank. These several provisions unmistakably show that, whatever the real nature of the three substances upon which royalties were to be paid, they were regarded by the parties, at the time, as distinguishable one from another. The very

particularity and distinctness of differences in the several royalty provisions are wholly inconsistent with the view that the parties did not, at least, think they were dealing with known distinguishable substances. If these substances were, in fact, distinguishable, there is not a single provision in the instrument to support a suggestion that they were not intended to be so. There would exist, therefore, no substantial basis whatever for the contention that, in order to give effect to the agreement of the parties the lease must be held to provide for the payment of the oil royalty, not only on oil, but also upon one of the constituent elements of casinghead gas. That "oil," "casinghead gas," and "natural gas" are names for distinguishable substances we do not regard as debatable. If the parties to the contract recognized that fact that is as far as our inquiry need go. The most elementary principles of the law of contracts become controlling. The chemical elements of each such substance, and how much of such two or more of the different substances may have in common, are matters wholly beside any question presented. That the parties to the lease regarded "oil" and "casinghead gas" as two different things is so manifest from the terms of the lease itself as to be beyond any question. Note, for instance, the express recognition of lessee's right not to save and utilize casinghead gas. That was not a strange provision, for we judicially know that, up to about the date of the lease, or a little later, casinghead gas was a by-product of oil wells, which was more often than not permitted to go to waste. In the lease care was taken to provide that the lessee was under no duty to save and utilize it, and that only in case it elected to do so was it to be charged a royalty thereon. What more persuasive evidence than this could there be that the parties were thus fixing their rights and obligations with reference to a substance which, as an entity was something entirely distinct from oil? As to the royalty on oil, lessor secured by the contract the right, or at least the option, to have one-eighth of the amount saved from the total produced delivered to him in kind. That provision applied to a substance which it was contemplated was capable of being stored in tanks. If we did not already judicially know it, the undisputed evidence supplies the knowledge that, by reason of the volatile nature of casinghead gas, it is not practicable to store it in tanks. As further showing that casinghead gas was regarded by the parties as a substance distinct from oil is the provision that no part of the casinghead gas was to be delivered to the lessor. Whatever may be said as to the oil, ownership and title to all of the gas passed to the lessee by the terms of the lease. Reynolds v. McMan Oil & Gas Co. (Tex. Com. App.) 11 S.W.(2d) 778; Id. (Tex. Com. App.) 14 S.W. (2d) 819; Magnolia Petroleum Co. v. Connel-

lee (Tex. Com. App.) 11 S.W.(2d) 158; Id. (Tex. Com. App.) 14 S.W.(2d) 1020.

Recognition in the lease, then, of lessee's right to save and utilize it, in case it wished to do so, really added nothing to lessee's right, except perhaps to make certain lessee's right not to save or utilize same. But lessee's ownership of all the gas necessarily comprehends ownership of every constituent element thereof. Magnolia Petroleum Co. v. Connellee, supra. Such ownership would certainly be inconsistent with a right in the lessor to a part of a constituent element thereof. Such a notion would involve a plain contradiction of terms.

Let us view the matter from a little different slant. Note that the lease does not provide that lessee shall only be obligated to pay the royalty on casinghead gas if same be saved and utilized in some particular way. The right to utilize it, therefore, included the right to make any use desirable. Suppose the lessee had utilized none of it in the manufacture of gasoline, but on the contrary had sold the same amount, as was, in fact, used in the manufacture of gasoline, to third parties (as indeed the evidence shows that it did sell same), for a money consideration. Could the lessee in such event successfully contend that it did not owe the specified royalty because, by merely selling it, it had not "utilized" the casinghead gas? We would have no hesitancy in overruling such a contention. But lessor's right to the royalty under those circumstances is no clearer than lessee's right to sell all the casinghead gas, which necessarily includes every constituent element of same. To hold otherwise would be simply to deny that lessee became owner of the gas. It seems to us too plain for argument that the existence of any right of lessor in addition to or beyond the right to receive the specified royalty of four cents per 1,000 cubic feet would be in plain conflict with lessee's ownership of all the gas in the land, a right that now seems to be recognized by every authority that has come to our notice.

Let us now examine briefly the premises upon which appellee makes the contrary contention. The argument has for its foundation two provisions of the lease. One is that the royalty on casinghead gas is "* * * *in addition to the royalty to which lessor may be entitled on the oil produced from such well.*" The other is the provision requiring the drilling of an offset well upon condition that a well be drilled upon adjacent land within 200 feet of the line, producing 200 barrels of oil per day for thirty consecutive days. Taking these up in order: It is argued as to the first that a rule of construction requires that an instrument be so interpreted, if possible, as to give meaning to every provision. It is contended that, unless the words, "in addition to the royalty * * * on the

oil produced from such well," be given the meaning contended for, the provision will be meaningless, or, more accurately stated, that it will serve no purpose, and the lease would mean precisely the same that it would without such provision. Or, still differently stated, the contention is that, in the provision quoted, we must construe the word "oil" to include the constituent element in casinghead gas which is capable of being manufactured into gasoline, or otherwise the words would serve no purpose and the rights of the parties be precisely the same as if they were omitted. It seems to us it would be preferable to regard the words as surplusage, rather than to give them a construction that would bring parts of the lease in conflict with each other, as has been shown would be the case. But is not the specified royalty provision as to casinghead gas as a fact "in addition to the royalty to which the lessor may be entitled on the oil produced from such well?" That is certainly a fact that will not be disputed. Then, why should the statement of a fact, just because it was so obviously true as actually not to require stating, be held to introduce an ambiguity into an otherwise perfectly clear provision? Rules of construction are but means of ascertaining the meaning of language, and it would be a clear misapplication of such rules to so apply them as to make plain language ambiguous. But is it true that the words serve no purpose? They show that it was contemplated that two of the substances were to come out of one well, and it was thereby made certain that one was not to supersede or be in lieu of the other. It was entirely appropriate to say that the royalty on one was in addition to the royalty on the other. There is thus afforded a reason why the same was not said of the royalty on natural gas which evidently it was contemplated would not be produced from a well which produced either of the other substances. But let's examine the contention a little further. The royalty on casinghead gas is to be *in addition to* the royalty on oil "produced from such well." How could one thing be in addition to another thing, and yet be a part of that other thing? It would certainly be unusual to speak of an entity—a unity—being in addition to a part of itself. It is so manifestly true as to be axiomatic that, if the royalty on casinghead gas is "in addition to the royalty on oil," then the substances oil and casinghead gas must necessarily be exclusive, each of the other.

Nor is there any greater merit, we think, in the suggestion that gasoline (a term never used in the lease) and oil must be held to have been identical within the contemplation of the parties, since otherwise it would be unreasonable to suppose that the parties would have intended to provide by the lease that the lessee should drill offset wells as against oil wells and have made no similar provision for offset wells in a case where an insignificant oil well produced great quantities of casinghead gas of perhaps much greater value than oil. Is the failure to make such provision any more remarkable than the one that was made expressly recognizing the right of the lessee not to save or utilize casinghead gas? Neither the making of the one provision nor the failure to make the other is at all strange, as we have already shown, because at the time casinghead gas was a substance generally regarded as a waste product. It would have been a most remarkable provision, in view of the one that was made, had the lease required an offset well, if a well producing casinghead gas was brought in on adjacent land. That would have introduced in effect a contradictory provision to the option expressly given the lessee not to save or utilize casinghead gas.

We would be content to rest the decision of the case upon the grounds already stated. If we are right in our views as expressed, it is wholly immaterial whether the lease conveyed all the oil or only seven-eighths of same. But, the question being raised, it is perhaps our duty to pass upon it, since, if the lease conveyed all the oil and not merely a part thereof, then appellee was not entitled to recover, regardless of the correctness of our views as already expressed.

In Ehlinger v. Clark, 117 Tex. 547, 8 S.W. (2d) 666, 667, the Supreme Court construed an instrument and held that it conveyed all the oil and gas in certain land, as against the contention that it conveyed only seven-eighths of the oil. The oil royalty provision in which was also to be found the exception, if it existed, was "to deliver to the credit of lessor, free of cost in the pipe line to which it, [lessee] may connect its wells, the equal one-eighth (⅛) part of all oil produced and saved from the leased premises." If no question was raised as to the authority of that decision by reason of the Supreme Court's subsequent approval of the opinion of the Commission of Appeals in Reynolds v. McMan Oil & Gas Co., supra, it would be deemed decisive of the question in appellant's favor. But, aside from any question involving the authority of either of those decisions, it is thought that the somewhat different provision in this lease merits consideration. In this lease all of the oil was conveyed, unless some part thereof was excepted by the provision that the lessee "shall deliver as royalty to said lessor free of expense, one-eighth (⅛) part of the oil *saved from that produced.*" (Italics ours.) The requirement that an instrument conveying land, to be sufficient, shall, by its own terms, identify the land conveyed or furnish the means of doing so, applies with equal effect to an exception from a conveyance. It is also the rule that, if the thing granted be certain and an attempted exception be uncertain within the above stated rule, the grant will stand and the exception fail. 18 C. J. 349; Waterhouse v. Gal-

lup (Tex. Civ. App.) 178 S. W. 773. Tested by these rules, can it be said that the lease excepts from the minerals conveyed a definite or certain part of the oil, or furnishes the means of making such part definite and certain? It plainly does not except one-eighth of the oil. The lease affirmatively shows that it was within the contemplation of the parties that not all the oil produced would be saved. Otherwise, there was no reason for limiting the royalties to the amount "saved from that produced." Lessor's interest, whether such interest was intended as only a royalty which it purports to be, or should, in addition to that, be construed to be an exception from the conveyance of a part of the oil in place, was expressly limited to "oil saved from that produced." If the provision be treated as an attempted exception, how could it be determined what definite proportional part is saved from that produced? If the provision was only one for the payment of royalty, the royalty could be accurately determined simply by measuring the oil saved. But if the provision is to be construed as an exception from the conveyance of oil in place, then the excepted interest could only be ascertained by measuring all the oil not saved and deducting same from the total amount produced. In other words, since by the express terms of the lease the exception, if it be an exception, is limited to the amount or proportion of oil "saved from that produced," thus showing that the amount saved and the amount produced are not regarded as necessarily the same, the amount not saved would always have to be ascertained and deducted from the total production as a basis for calculating the excepted interest. The terms of the lease did not and could not in advance identify the exact quantum of oil that would be saved. Nor do we think it can be said that it furnishes the means for doing so. It is true that if there was any practicable method of exactly metering the total production of oil from a well before and without reference to whether same was saved or not saved, then the proportion that the amount saved bore to the total amount produced would be determinable as a matter of simple calculation. But we know as a matter of common knowledge that, generally, parties are not interested in the exact amounts, usually insignificant, of oil wasted. Neither are the parties interested in the exact amount produced as distinguished from the amount saved. It is the oil saved and gauged that becomes the basis for the payment of royalties and contracts with reference to the product, and for all practical purposes that concerns the parties in interest, the amount saved may be regarded as the amount produced. But the law of conveyances, as above mentioned, makes it vitally important, if this provision is to be regarded as an exception, that there be determined the exact amount of oil not saved from the total produced, as an indispensable requisite to the ascertainment of exactly what proportion the amount saved bears to the total amount produced.

As illustrating the importance of the amount of oil not saved, whether much or little, in considering whether this provision be an exception or not, suppose an oil well on the lease, without fault or negligence on the part of the lessee, ran wild for a few days or a few weeks, and a large quantity of oil escaped to the land of a third person, where it was capable of being identified and recovered, but for the fact that such third person converted it. Could the lessor, upon the lessee failing to do so, maintain a suit direct against such third person for one-eighth of the value of the oil converted? In such a suit the lease would wholly fail to prove lessor's title because, by the granting clause, as interpreted by the decisions, it purports to convey all the oil, and when the exception is looked to it expressly does not exclude or except from the grant oil not saved. Because of the difference in the total amount of oil produced and the amount saved, however insignificant that difference, it results that if the royalty due the lessor means exactly his interest in the oil in place as an excepted interest in the land, that interest is a most variable and uncertain thing. It would not necessarily be the same on any two different days. It seems to us wholly inconsistent with principles governing land tenures, to hold that the ownership of an interest in land may be shown by proof, which may show and likely would show that such interest is never the same on any two different days, and the proof of which interest is necessarily parol, consisting of evidence showing probably insignificant amounts of waste oil. Since the parties, by said provision, have not purported to make an exception from the conveyance, but have expressly purported to fix a royalty with reference to a given product, it seems clear to us that the provision was not intended as an exception, and should not be held to have the effect of an exception.

That the parties did not intend by the provision to make an exception is shown by the further provision that the one-eighth part of the oil saved from that produced was to be so delivered "as a royalty." Bouvier defines "royalty" as, "A payment reserved by grantor of a patent mining lease, etc., and payable proportionally to the use made of such right." 3 Bouv. Law Dict. 2975. Webster's International Dictionary defines the word as, "A share of the product or profit, (as of a mine, forest, etc.) reserved by the owner for permitting another to use the property." Since in this state, under the decision of our courts, the lease itself passed as an incident of ownership the right to use the property to produce oil and gas, as well as to use the oil and gas when produced, a royalty can only mean an additional consideration to be paid for the thing (that is, minerals) granted. That such

additional consideration is payable as a proportion of a given product in kind, rather than in money, is, to say the least, of no controlling importance in itself. Theisen v. Robison, 117 Tex. 489, 8 S.W.(2d) 646. Why then was it specified that the delivery of one-eighth of the oil should be "as royalty"? Certainly, if the royalty provision was intended to be not only a royalty provision but, in addition to that, an exception from the conveyance of an interest in land, such intent would have been better expressed by omitting the words "as royalty." It seems to us that here is a proper occasion to apply the rule contended for by appellee in another connection, that the words should, if possible, be given some effect. The only possible effect the words can have is to show that, of the two things the provision may be, a royalty provision or an exception, it is the former and not the latter.

We are therefore of opinion that the lease should be construed as conveying to the lessee the entire ownership of the oil in place, a part of the consideration for which was the obligation to deliver the royalty oil as personal property.

The judgment of the trial court will therefore be reversed, and judgment here rendered for appellant.

HICKMAN, C. J.

I am unable to agree with the holding of the majority that the lease under construction should be construed as a conveyance to the lessee of the entire ownership of all of the oil in place, and that the provision for royalty on the oil was but an obligation to deliver personal property as a part of the consideration for the lease. The phrase, "⅛ part of the oil saved from that produced," to my mind cannot be distinguished in meaning and effect from the phrase, "⅛ part of all oil produced and saved." The latter phrase has been held to except from the grant one-eighth of the oil. Hager v. Stakes, 116 Tex. 453, 294 S.W. 835; Reynolds v. McMan Oil & Gas Co. (Tex. Com. App.) 11 S.W.(2d) 778; Cobb v. Downing (Tex. Civ. App.) 1 S.W.(2d) 508 (error refused); Harris v. Lone Star Gas Co. (Tex. Civ. App.) 19 S.W.(2d) 178 (error refused).

To my mind, in order to warrant a distinction between the two phrases it must be presumed that the purpose of the lease under construction was not to produce and save oil, but that the lessee was licensed to waste a certain indefinite portion thereof.

Nor do I think the expression "as a royalty" should be construed to affect the exception

from the grant. One of the leases construed in Hager v. Stakes, supra, designated the oil excepted from the grant as a royalty, and this was not given any controlling effect. The controlling provision, to my mind, is that royalty in kind was to be paid, and I cannot believe that, where the obligation is to deliver one-eighth of the oil saved, the effect of the grant should be altered by the fact that this oil is denominated as a royalty.

I concur in the judgment recommended by my associates, because I believe that the instrument before us speaks specifically with respect to the royalty on casinghead gas; that that royalty is four cents per thousand cubic feet of the amount saved and utilized; and that, in specifying that royalty on casinghead gas the parties intended it to cover all the constituent elements thereof, as held in Magnolia Petroleum Co. v. Connellee (Tex. Com. App.) 11 S.W.(2d) 158, and Magnolia Petroleum Co. v. Akin (Tex. Com. App.) 11 S.W.(2d) 1113.

Not being able to concur in the other ground upon which the opinion of the majority rests, I have deemed it advisable thus briefly to note my position.

### On Rehearing.

FUNDERBURK, J.

In the statement of the case made in the original opinion it was said: "(Over $400,-000.00 was paid by lessee to the lessor in royalties)." In their motion for rehearing appellees complain of this statement. It was not necessary but wholly immaterial to any question discussed in the opinion. Since it is objected to it is withdrawn.

In the original opinion only two members of the court concurred in the holding that the instrument in question conveyed all the oil and not only seven-eighths. Upon a re-examination of that question, Judge Leslie has come to question if our holding on that point is not in conflict with Reynolds v. McMan Oil & Gas Co. (Tex. Com. App.) 11 S.W.(2d) 778, and prefers to rest our judgment wholly upon the other ground discussed. It is therefore to be understood that what was said in the opinion on the particular question is to be regarded as an expression of the writer's individual views and not that of the court.

We are all agreed that the case is ruled by the decision in Magnolia Petroleum Co. v. Connellee (Tex. Com. App.) 11 S.W.(2d) 158, and that the motion for rehearing should be overruled.

It is accordingly so ordered.