**Robert K. HUTCHINGS,**
**et al., Appellants,**

v.

**CHEVRON U.S.A., INC., Appellee.**

No. 08–91–00404–CV.

Court of Appeals of Texas,
El Paso.

Sept. 8, 1993.

Rehearing Denied Oct. 6, 1993.

Andrew M. Taylor, Bracewell & Patterson, Austin, William Key Wilde, Bracewell & Patterson, Van E. McFarland, Van McFarland & Associates, Houston, William B. Browder, Jr., Stubbeman, McRae, Sealy, Laughlin & Browder, Midland, for appellants.

Hal Upchurch, Monahans, J. Knox Moore, Brady, Wm. Randall Lundy, Jr., Texaco Inc., Denver, CO, C.B. McDaniel, Hondo Oil & Gas Co., Roswell, NM, Charles Tighe, Julia E. Vaughan, Cotton, Bledsoe, Tighe & Dawson, Midland, Richard Henderson, Victoria, for appellee.

Before KOEHLER, BARAJAS and LARSEN, JJ.

## OPINION

KOEHLER, Justice.

This is an oil and gas case in which Chevron U.S.A. sought a declaratory judgment defining its royalty obligations under a long term lease. The royalty owners, represented here by two groups (the Abel Appellants and Mobil–OXY), counterclaimed for underpaid royalties. By partial summary judgment, the trial court interpreted the casinghead gas royalty clause of the lease to provide for a ⅛ of four cents per mcf royalty on casinghead gas Chevron sold. At trial, the jury found that Chevron had not underpaid royalties. From a judgment on the verdict and the summary judgment, the two groups of Appellants bring this appeal. We affirm.

## RELEVANT FACTS

On August 4, 1925, the Hutchings Joint Stock Association executed an oil and gas lease with Gulf Production Co. ("HSA Lease"). The HSA Lease covers 30,450 acres of land in Ward County, Texas, south of Monahans. Chevron U.S.A., Inc. ("Chevron") is Gulf's successor in interest. The Appellants (the "Abel Appellants" and Mobil–OXY or "Mobil") are some of the present royalty owners under the HSA Lease.

The lease contains different royalty provisions relating to oil, natural gas, and casinghead gas. Chevron filed this suit for a de-claratory judgment interpreting the royalty provisions. Chevron claims that the casinghead gas sold by it is and should be controlled by the royalty provision relating to casinghead gas. The royalty owners counterclaimed for underpaid royalties. They contend that casinghead gas sold by Chevron is governed by the royalty clause for natural gas "used off the premises or marketed," which requires the royalty payment to be based on net proceeds. The trial judge granted partial summary judgment declaring that the lease required royalties on casinghead gas sold by Chevron to be paid only in accordance with the casinghead gas "save[d] and utilize[d]" royalty provision, which provides a royalty of ⅛ of four cents per mcf. The suit then went to trial, the jury finding that Chevron had not underpaid royalties. The court rendered a take-nothing judgment against the royalty owners, and they appeal.

## ISSUES PRESENTED

The royalty owners argue [1] that the trial court erred both in granting Chevron's motion, and in denying their motion, for partial summary judgment and in rendering judgment for Chevron based on the jury's answer to Question No. 1. They assert that, as a matter of law under terms of the lease, they were entitled to ⅛ of Chevron's net proceeds from the sale of the casinghead gas, not just ⅛ of four cents per mcf. The royalty owners also contend that they proved as a matter of law or by the great weight and preponderance of the evidence that Chevron had underpaid royalties, contrary to the jury's finding. The Abel Appellants further contest the admission of one expert witness's testimony. Appellant Mobil also appeals from the trial court's refusal to order an accounting of royalties due and paid. By a conditional cross-point, Chevron argues that the trial court should have ruled that limitations barred any claims for royalties underpaid more than four years before the royalty owners filed their claims.

---

1. The Abel Appellants in four points of error and the Mobil–Oxy Appellants in twelve points of error.

## SUMMARY JUDGMENT

In a summary judgment appeal, we must determine whether the successful movant in the trial court carried its burden of showing that there is no genuine issue of a material fact and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co., Inc.*, 690 S.W.2d 546, 548 (Tex.1985). In deciding whether or not there is a disputed fact issue precluding summary judgment, evidence favorable to the non-movant is to be taken as true, and in that connection, every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in his favor. *Nixon*, 690 S.W.2d at 548–49.

## LEASE CONSTRUCTION

Because the partial summary judgment was based on a question of law, the first issue is whether the court correctly determined the construction of the royalty provisions of the HSA Lease. The parties agree that the lease was unambiguous. When parties disagree over the meaning of an unambiguous contract, the court must determine the intent of the parties. This determination must be based upon the objective intent of the parties as expressed in the agreement, and not their present interpretation. The construction of an unambiguous contract is a question of law for the court. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *First City Nat'l Bank of Midland v. Concord Oil Co.*, 808 S.W.2d 133, 137 (Tex. App.—El Paso 1991, no writ). To determine the objective intent of the parties, a court should examine the entire instrument in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *Coker*, 650 S.W.2d at 393.

The royalty provisions of the lease provided as follows:

If oil shall be found on said premises, Lessee shall deliver as royalty to Lessor, free of expense, an [sic] one eighth (⅛) part of the oil saved from that produced after deducting such part as maybe used for drilling and operating on the landand [sic] treating the oil or gas as to make it merchantable; .... [2] *If Lessee shall oper-* *ate so as to save and utilize casing head gas from said premises, then Lessee shall pay as royalty to Lessor, one eighth (⅛) part of the value of such gas, calculated at the rate of four cents (4) per one thousand (1000) cubic feet of the casing head gas,* .... [3] *If any well on said premises shall produce natural gas in paying quantities, andssuch [sic] natural gas is used off the premises or marketed by Lessee,* then Lessor shall bepaid [sic] at the rate of one-eighth (⅛) of the net proceeds of the sale of such gas at the mouth of the well. [Emphasis added].

The lease was signed on August 4, 1925. We are faced with the question of whether the lease required Chevron to pay royalties on casinghead gas it sold in accordance with the second or the third provision.

Casinghead gas is "[g]as produced with oil in oil wells, the gas being taken from the well through the casinghead at the top of the well, as distinguished from gas produced from a gas well." Williams and Meyers, MANUAL OF OIL AND GAS TERMS, (8th ed. 1991). It has been judicially noticed that until about 1918, casinghead gas was a by-product of oil production that was "more often than not permitted to go to waste." *Gulf Prod. Co. v. Taylor*, 28 S.W.2d 914, 917 (Tex.Civ.App.—Eastland 1930, writ dism'd). Chevron has sold casinghead gas drawn from its oil wells on this tract since 1937. As previously noted, Chevron maintains that the second royalty term of the lease applies, requiring it to pay royalties on the casinghead gas it sold at the rate of ⅛ of four cents per mcf. Appellants argue that casinghead gas sold by Chevron was governed by the third royalty clause, and Chevron should have paid royalties at the rate of ⅛ of the net proceeds from the sale of the gas. The trial court agreed with Chevron and granted partial summary judgment interpreting the contract to require Chevron to pay only ⅛ of 4 cents per mcf as royalty on the casinghead gas it sold. The parties proceeded to trial under this interpretation of the lease.

In their challenge of the trial court's holding, the royalty owners rely primarily upon *Southland Royalty Co. v. Pan Am. Petrole-*

*um Corp.*, 378 S.W.2d 50 (Tex.1964). The lease in *Southland* contained three royalty provisions: the first provided for a royalty of ⅛ of the oil produced and saved and ⅛ of the proceeds from potash and other minerals; the second paragraph provided for a flat-rate royalty on gas-well gas used off the premises; and the third provided for a flat royalty on gas produced from oil wells and used off the premises. *Southland Royalty Co.*, 378 S.W.2d at 52. The Supreme Court determined that gas was included within "other minerals" on which a ⅛ of proceeds royalty was due, and that gas "used off the premises" did not include gas sold for use off the premises. *Id.* at 54, 57. The royalty owners analogize *Southland* to the case at bar, arguing that if Chevron markets casinghead gas, it is governed by the royalty provision for natural gas "used off the premises or marketed" rather than the flat-rate royalty on casinghead gas "save[d] and utilize[d]." Unlike the case at bar, the Supreme Court held that the clause "used off the premises" in the *Southland* lease was ambiguous. *Southland*, 378 S.W.2d at 56. The *Southland* ruling was based upon a perceived conflict between the ⅛ of net proceeds royalty for "other minerals," including gas, and the flat-rate royalties on gas "used off the premises." *Southland*, 378 S.W.2d at 57. Because it held that gas was included within "other minerals," the Supreme Court was forced to reconcile that royalty provision with the ones governing gas used off the premises. The Court did so by deciding that gas sold by the lessee was not included within gas "used off the premises." The Court wrote that the expression "used off the premises" did not necessarily exclude gas sold by the lessee, but that in the *Southland* lease, it was the only way to reconcile the various royalty provisions.[2] *Southland*, 378 S.W.2d at 56–57.

■ Although casinghead gas is a form of natural gas, a fact admitted by Chevron, that fact is not dispositive of whether the parties in 1925 intended and desired sales of casinghead gas to be governed by the natural gas royalty provision, rather than the one relating to casinghead gas royalties. Significantly, a 1925 hornbook on oil and gas law defines casinghead gas as a component part of oil. Thornton, THE LAW RELATING TO OIL AND GAS, at 391 (4th ed. 1925).[3] The case of *Livingston Oil Corp. v. Waggoner*, 273 S.W. 903 (Tex.Civ.App.—Amarillo 1925, writ ref'd) is also probative. The lease in that case provided for a ⅛ royalty on oil produced, and a flat royalty on gas from each well where gas only was found. The Amarillo Court of Civil Appeals determined that casinghead gas was a constituent element of oil, and that the lessee was required to pay a ⅛ royalty on production of casinghead gas under the oil royalty provision. *Livingston Oil Corp.*, 273 S.W. at 906. *See also Poe v. Humble Oil & Refining Co.*, 288 S.W. 264, 266 (Tex.Civ. App.—Eastland 1926) ("The courts will take judicial knowledge that casing-head gas or gasoline is oil."), *rev'd on other grounds*, 29 S.W.2d 1019, 1020 (Tex.Comm'n App.1930, judgm't adopted) ("There is a well-defined distinction in law between gas produced from a gas well · and casing-head gas."). These authorities indicate that in 1925, casinghead gas was considered a part of oil. The net result of these cases is that in 1925, the "natural gas" royalty provision of the HSA Lease did not necessarily include casinghead gas which was considered a constituent of oil at the time.

More persuasive than *Southland* is the case of *Gulf Prod. Co. v. Taylor*, cited above, in which the Court was confronted by a 1918 oil and gas lease with royalty provisions nearly identical to those in the case *sub judice*. The *Taylor* lease read:

> If oil shall be found in paying quantities on said premises, the Company shall deliver as royalty to said lessor, free of expense, one-eighth (⅛) part of the oil saved from that produced ... *if said Company shall operate so as to save and utilize casinghead gas from said premises*, (as it may do if it wishes) then it shall pay as

---

2. Another way to reconcile the conflict which had been adopted by this Court in *Southland* before its appeal to the Supreme Court, was to read "other minerals" to exclude gas. The Supreme Court found this interpretation to conflict with a large body of case law. *Southland*, 378 S.W.2d at 53–54.

3. Attached as Exhibit 4 to Chevron's brief.

royalty to lessor one-eighth (⅛) of the value calculated at the rate of four (4) cents per thousand (1000) cubic feet, of the casinghead gas so saved, in addition to the royalty to which lessor may be entitled on the oil produced from such oil well ... and *if any well on said premises shall produce natural gas in paying quantities, and such natural gas be used off the premises or marketed* by said Company, then lessor shall be paid one-eighth of the net proceeds received from the sale of gas at the mouth of the well.... [Emphasis added].

*Taylor,* 28 S.W.2d at 915. The royalty owner was paid ⅛ of four cents per mcf for casinghead gas produced on the lease which was processed into gasoline and sold by the lessee. The lessor sought additional royalties in the amount of ⅛ of the value of the gasoline, under the oil royalty provision of the lease. *Taylor,* 28 S.W.2d at 915. The Eastland Court of Civil Appeals rejected his argument, writing that the parties had clearly intended to distinguish oil, gas, and casinghead gas as different substances on which different royalties would be due. *Id.* at 916–17. The Court rejected a limitation on the casinghead gas royalty provision based upon the use made of the casinghead gas. *Id.* at 917. The Court wrote that it was not limited to a particular utilization of the casinghead gas, and that the sale of the gas to third parties was a means of "utiliz[ing]" it within the meaning of the royalty provision for casinghead gas "save[d] and utilize[d]." *Id.* The only royalty due on the casinghead gas was the specified ⅛ of four cents per mcf. *Id.*

Additionally, the *Taylor* Court wrote that as a matter of common knowledge at the time the lease was executed, "casinghead gas, or the gas produced from oil wells, was relatively less important than natural gas or gas from a well producing gas only." *Id.* at 916. This indicates a distinction made at the time between casinghead gas and natural gas, bolstering Chevron's argument that the "natural gas" royalty provision of the HSA Lease was not intended to include casinghead gas.

*Taylor* provides a nearly contemporaneous interpretation of royalty terms almost identical to those of the case at bar. The *Taylor* Court noted a distinction between casinghead gas and natural gas, found that the parties had recognized that distinction in drafting the royalty provisions, stated that "utiliz[ing]" casinghead gas includes the sale of that gas, and held that the only royalty due on casinghead gas sold by the lessee was ⅛ of four cents per mcf. This 1930 case provides highly persuasive authority for interpreting the 1925 HSA Lease to allow a royalty of only ⅛ of four cents per mcf on casinghead gas sold by Chevron. We conclude, based in part on the similarities of *Taylor* and the distinctions of *Southland* that the trial court's interpretation of the lease was correct. We therefore hold that the sale of casinghead gas is governed by the second lease provision relating to the saving and utilization of casinghead gas. Abel Point of Error No. One and Mobil Points of Error Nos. One through Eight are overruled.

### SUFFICIENCY OF THE EVIDENCE

The royalty owners also challenge the legal and factual sufficiency of the evidence to support the jury's finding that Chevron had not failed to pay royalties due them. They contend that they proved underpayment of royalties as a matter of law or by the great weight and preponderance of the evidence. In considering a legal insufficiency or "proved as a matter of law" point, the appellate court considers only the evidence which tends to support the jury's findings and disregards all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965); *Worsham Steel Co.,* 831 S.W.2d 81. A factual insufficiency point requires examination of all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (Tex.1951); *Worsham Steel Co. v. Arias,* 831 S.W.2d 81 (Tex.App.—El Paso 1992, no writ). The reviewing court cannot substitute its conclusions for those of the jury. If there is sufficient competent evidence of probative force to support the finding, it must be sustained. *Carrasco v. Goatcher,* 623 S.W.2d 769 (Tex.App.—El Paso 1981, no writ). It is not within the

province of the Court to interfere with the jury's resolution of conflicts in the evidence or to pass on the weight or credibility of the witness's testimony. *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792 (1951); *Reynolds v. Kessler,* 669 S.W.2d 801, 807 (Tex.App.—El Paso 1984, no writ). Where there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. *Montgomery Ward & Co. v. Scharrenbeck,* 204 S.W.2d 508 (Tex.1947); *Clark v. National Life & Accident Ins. Co.,* 145 Tex. 575, 200 S.W.2d 820 (1947); *Oechsner v. Ameritrust Texas, N.A.,* 840 S.W.2d 131, 136 (Tex.App.—El Paso 1992, writ denied).

Because the royalty owners presented several theories in support of their claim that Chevron had failed to pay the royalties properly, the jury's "No" answer to Question No. 1 of the charge required the jury to make the following implied findings, based on the instructions in the charge: (1) All gas drawn from Chevron's oil wells was "casinghead gas," rather than natural gas produced from a gas stratum, and there was no commingling of casinghead gas with natural gas produced through oil wells; (2) Chevron prudently marketed the gas produced from the lease; and (3) Chevron did not make accounting errors based upon volume discrepancies resulting in improper royalty payments. Because the royalty owners challenge the factual and legal sufficiency of the evidence to support each of these findings, they will be addressed separately.

### ALL GAS WAS CASINGHEAD GAS

■ The royalty owners theorize that Chevron illegally produced natural gas from its oil wells and wrongfully characterized that gas as casinghead gas in order to pay a smaller royalty on the gas. As explained by the Texas Supreme Court in *Amarillo Oil Co. v. Energy–Agri Products, Inc.,* 794 S.W.2d 20, 25 (Tex.1990), separate reservoirs of oil and natural gas may exist at different subsurface planes under the same well. If a gas reservoir, or "gas cap," exists at a horizon above an oil reservoir, then natural gas may be produced from an oil well through perforations in the well casing at the level of the gas cap. This gas will not be casinghead gas; only gas produced from the oil stratum is casinghead gas. *See generally Amarillo Oil Co.,* 794 S.W.2d at 20–25. Texas Railroad Commission Rule 13(b)(4)(B) requires oil well casings to be perforated in the oil-saturated portion of a reservoir below the gas-oil contact, defined as the line between the oil zone and the gas zone of a reservoir. 16 Tex.Admin.Code § 3.13(b)(4)(B) (West 1993); Williams and Meyers, Manual of Oil and Gas Terms, (8th ed. 1991). Perforations in the gas cap are referred to as "high perfs." The royalty owners argue that illegal "high perfs" caused the production of natural gas from gas caps through oil wells, on which Chevron underpaid royalty by mischaracterizing the gas as casinghead gas.

The evidence on this issue was conflicting. The royalty owners' expert concluded that Chevron had produced natural gas from high perfs. However, Chevron presented evidence that any gas cap which may have once existed in the field had been dissipated by the late 1950's. Other Chevron witnesses testified that there was no gas/oil contact in the field after a waterflood[4] in the 1950's.

■ The royalty owners rely heavily upon a statement by Kevin Sullivan, Chevron's petroleum engineer, that two wells were perforated in gas pockets. Sullivan went on to explain that one well was cement-squeezed to eliminate gas production from that well. A "cement squeeze" is defined as "[a] method whereby perforations and fissures in well walls may be sealed off." Williams and Meyers, Manual of Oil and Gas Terms, (8th ed. 1991). The other well was actually drilled to supply gas for an injection project on the leasehold. In 1963, that well was cement-squeezed and deepened to produce from an oil strata. Sullivan's testimony does not demonstrate that Chevron produced and sold natural gas from oil wells or commingled natural gas with casing-

---

4. Water flooding is a method of secondary recovery of oil "in which water is injected into an oil reservoir for the purpose of washing the oil out of the reservoir rock and into the bore of a producing well." Williams and Meyers, Manual of Oil and Gas Terms, (8th ed. 1991).

head gas.[5]

Because the evidence on this matter was conflicting, the jury's verdict may not be overturned; the jury could reasonably have determined that the royalty owners failed to prove that Chevron produced natural gas from its oil wells. Since the jury was justified in making this determination, it could also have found that there was no commingling of casinghead gas with natural gas produced from oil wells. This argument provides no basis for reversal.

### CHEVRON PRUDENTLY MARKETED

 The royalty owners argue that Chevron underpaid royalties by failing to obtain the best possible price for the gas it produced, breaching its duty to market the gas prudently. An oil and gas lease includes an implied duty to manage and administer the lease. *Cabot Corp. v. Brown,* 754 S.W.2d 104, 106 (Tex.1987). This duty includes a duty to obtain the best price reasonably possible for the marketed production.[6] *Id.* "Under a gas royalty clause providing for royalties based on market value, the lessee has an obligation to obtain the best current price reasonably available." *Cabot Corp.,* 754 S.W.2d at 106. The lessee is held to the standard of care of a reasonably prudent operator under the same or similar circumstances. *Id.* The jury was instructed on this standard.

The trial court further instructed the jury that with respect to certain royalty owners who had settled a prior lawsuit, Chevron's duty to market production was embodied in a letter from Morgan Copeland, Chevron's former general counsel and negotiator of the settlement, to Preston Shirley (known as the "Copeland Letter"). Chevron objected to this instruction. The royalty owners argue that there is no reason to distinguish the settling royalty owners from them, and therefore the Copeland Letter also reflects Chevron's duty to prudently market with respect to them.

The Copeland Letter, dated January 16, 1980, provided that Chevron would calculate the net proceeds from the sale of gas on the basis of the "prevailing price" for the gas, as agreed upon by Chevron and Valero Industrial Gas Company ("Valero"), which was not to exceed the maximum lawful price under the Natural Gas Policy Act of 1978 (NGPA). The royalty owners contend that the prevailing price was the price established by NGPA section 102, and royalties should have been based on that price. However, Thomas Liles, Chevron's gas marketing expert, testified that the NGPA section 102 price was not the "prevailing price" under the contract until 1985, when a price established in 1980 for 1985 sales exceeded the NGPA price. Valero never paid that price because by a December 27, 1984 letter, Valero and Chevron agreed to a lower price pursuant to a portion of the contract permitting renegotiation in case of economic hardship to either party.[7] Liles testified that the agreed-upon price was a reasonable market price for the gas. The royalty owners contend that this agreement did not affect Chevron's duty to pay royalties based upon the maximum lawful price under the NGPA, because the contract price was modified under the economic hardship provision, rather than the "prevailing price" section.

Liles opined that Chevron marketed the gas prudently. He stated that from March 1985 to September 1986, royalty was paid at

---

**5.** The royalty owners also point to a "gas-oil ratio" showing that one well produced as much as 85,000 cubic feet of gas per barrel of oil. However, a reservoir is considered an oil stratum, and the gas produced therefrom is casinghead gas, if a well produces 100,000 cubic feet of gas or less per barrel of oil. *Amarillo Oil Co.,* 794 S.W.2d at 25.

**6.** This duty does not apply to the sale of casinghead gas, because the lease provided for a set royalty amount on that gas, and the royalty was not dependent upon the proceeds from sale of the gas. *See Cabot Corp.,* 754 S.W.2d at 106; *El*

*Paso Natural Gas Co. v. American Petrofina Co. of Texas,* 733 S.W.2d 541, 550 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.), *cert. dism'd,* 485 U.S. 930, 108 S.Ct. 1102, 99 L.Ed.2d 264 (1988). ("The operator of an oil and/or gas lease has an implied duty to act in good faith in marketing the gas of its royalty owners *when the amount of the royalty depends upon the price at which the product is marketed.*") [Emphasis added].

**7.** In fact, Valero did not purchase any gas under the contract from 1985 to December 1990.

a rate in excess of the market price. For some time prior thereto, the royalty was based upon the NGPA section 102 price, or the maximum lawful price for gas. The royalty owners brought forth no evidence demonstrating that Chevron could have obtained a higher price for gas than it actually received. The jury could reasonably have found that Chevron did not breach its implied duty to market the gas, but acted as a reasonably prudent operator under the circumstances because the royalty owners were paid at a rate equal to or greater than the market rate. This argument affords no ground for reversal.

## VOLUME DISCREPANCIES

The royalty owners' expert accounting witness, Mark Layton, reviewed Chevron's royalty calculation worksheet volumes and compared those volumes to the production volumes reported to the Railroad Commission. The royalty owners contend that discrepancies between the production volumes reported to the Railroad Commission and the volumes used to calculate royalties demonstrate that Chevron underpaid royalties. The discrepancy amounted to about 8,500 mcf, the royalty on which Layton valued at $35,000.

Layton admitted to taking a "shortcut" in his calculations, because "it would cost more to make this calculation than the affect on our calculation." Layton also admitted error in failing to deduct certain expenses in his calculations. No other evidence was presented on the volume discrepancies identified by Layton. The issue for this Court is whether the jury was required to accept Layton's conclusions.

■■■■■ Expert opinion testimony does not establish any material fact as a matter of law. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986). When circumstances tend to discredit or impeach expert testimony, that testimony does no more than raise a fact issue. *Id.* Layton's own testimony regarding his use of a computational shortcut and his errors in calculation discredited his testimony to some degree. The royalty owners bore the burden of proving by a preponderance of the evidence that Chevron had failed to make proper royalty payments based on volume. The jury was free to find that Layton's testimony alone did not satisfy this burden of proof. There is no basis here for a reversal.

In sum, the royalty owners did not prove as a matter of law or by the great weight and preponderance of the evidence that Chevron underpaid royalties. The Abel Appellants' second and third points of error and Mobil Points of Error Nos. Nine and Ten are overruled.

## ADMISSION OF EVIDENCE

■■■■■ The royalty owners complain that the trial court erred in admitting into evidence the testimony of Chevron expert Thomas Liles, comparing the prices on which royalties were paid with spot market prices. Admission or exclusion of evidence is a matter within the trial court's discretion. *Syndex Corp. v. Dean,* 820 S.W.2d 869, 873 (Tex. App.—Austin 1991, writ denied); *Dudley v. Humana Hosp. Corp.,* 817 S.W.2d 124, 126 (Tex.App.—Houston [14th Dist.] 1991, no writ). To obtain a reversal of a judgment based upon a trial court's decision to admit or exclude evidence, the Appellant must show: (1) that the trial court abused its discretion in making the decision; and (2) that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394 (Tex.1989); Tex.R.App.P. 81(b)(1). Wide discretion is afforded to the trial court in determining whether to admit or exclude expert testimony regarding ultimate fact issues in a case. *Herrera v. FMC Corp.,* 672 S.W.2d 5, 7 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.); *Dillard v. Broyles,* 633 S.W.2d 636, 643–44 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.), *cert. denied,* 463 U.S. 1208, 103 S.Ct. 3539, 77 L.Ed.2d 1389 (1983).

■■■ The royalty owners contend that Liles' testimony was irrelevant because his testimony comparing spot market prices with prices obtained by Chevron for the gas was not probative of the best price obtainable for the gas, i.e., the price under the long-term contract with Valero. However, Liles' testimony was relevant to the best price reason-

ably obtainable by a reasonably prudent gas seller. The testimony was highly relevant to whether Chevron acted as a reasonably prudent lessee, or breached its implied duty to prudently market the gas. Therefore, the trial court did not abuse his discretion in admitting the evidence. The Abel Appellants' Point of Error No. Four is overruled.

### ACCOUNTING

In addition, Appellant Mobil contends that the trial court erred in refusing to order Chevron to render an accounting of royalty payments made and which should have been made on the gas produced from the lease. Mobil argues that it was impossible or impracticable for them to ascertain the amount of royalties paid and the amount legally due and payable, and therefore the trial judge should have ordered Chevron to render an accounting of royalties paid. In response, Chevron contends that an equitable accounting need not be ordered when the party seeking an accounting has an adequate alternative remedy, and Mobil has failed to explain the inadequacy of standard discovery procedures to obtain the information it desired.

■■■■ An equitable accounting is proper when the facts and accounts presented are so complex that adequate relief may not be obtained at law. *Richardson v. First National Life Ins. Co.,* 419 S.W.2d 836, 838 (Tex.1967). Mobil has not explained why the standard discovery procedures, such as requests for production, interrogatories, and *subpoena duces tecum,* were inadequate to provide it with the information sought regarding the payment of royalties. Mobil could have obtained adequate relief at law by the use of those legal procedures. The trial court did not err by failing to order an accounting.

■■■ Furthermore, Mobil did not object to the submission of Question No. 1 to the jury, asking whether Chevron had underpaid royalties. The jury's determination that Chevron had not underpaid royalties, supported by sufficient evidence, is binding on Mobil. Therefore, Mobil's request for an accounting is moot; the jury's finding that Chevron had not underpaid royalties fore-

closes any possibility that Mobil was entitled to recover such damages. *Compare Advertising and Policy Comm. of the Avis Rent A Car Sys. v. Avis Rent A Car Sys.,* 780 S.W.2d 391 (Tex.App.—Houston [14th Dist.] 1989), *vacated as settled,* 796 S.W.2d 707 (Tex.1990) (request for an accounting abandoned when the party seeking it sought to prove damages at trial and asked the jury to determine damages). Mobil's Points of Error Nos. Eleven and Twelve are overruled.

### LIMITATIONS

By a conditional cross-point, Chevron contends that if the suit is reversed, the Court should rule that limitations bars the royalty owners' claims for royalties underpaid more than four years before the filing of their counterclaim. In view of our resolutions of the Appellants' points of error, it is unnecessary for us to consider this cross-point.

Judgment of the trial court is affirmed.