**T.F.W. MANAGEMENT, INC. and Timothy F. Williams, Appellants,**

v.

**WESTWOOD SHORES PROPERTY OWNERS ASSOCIATION, Appellee.**

No. 14–01–00196–CV.

Court of Appeals of Texas, Houston (14th Dist.).

June 13, 2002.

Rehearing Overruled July 11, 2002.

Christopher M. McDowell, Jackson D. Wilson, Dallas, for appellants.

Patrick D. Sullivan, Houston, for appellees.

Panel consists of Chief Justice BRISTER and Justices ANDERSON and FROST.

## MAJORITY OPINION

JOHN S. ANDERSON, Justice.

Appellants T.F.W. Management, Inc. ("T.F.W."), and Timothy F. Williams appeal a summary judgment ordering T.F.W. to render an accounting of the assessment, collection, and expenditure of all fees appellee Westwood Shores Property Owners Association ("the Association") turned over to T.F.W. and its predecessor in interest. We reverse and remand.

### FACTUAL AND PROCEDURAL BACKGROUND

Beginning in 1972, BRL Joint Venture, later known as Westwood Shores, Inc. ("the Developer"), began developing a number of subdivisions generally known as

Westwood Shores. The development eventually comprised nineteen subdivisions, centered around a country club complex, the Westwood Shores Country Club, which was initially owned by the Developer. The County Club included a golf course, practice facility, clubhouse, swimming pool, tennis courts, and parking areas.

The Reservations, Restrictions, and Covenants ("RR & Cs") of the subdivisions provided each lot was subject to a maintenance charge, which was to be used to create a fund known as the "Maintenance Fund." The RR & Cs also initially provided, "The maintenance charges collected shall be paid into the Maintenance Fund to be held and used for the benefit, directly or indirectly, of the Subdivision; and such Maintenance Fund may be expended by the Developer for any purposes which, in the judgment of the Developer will tend to maintain the property values in the Subdivision."

Under the heading of "Recreational Facilities Membership," the RR & Cs initially provided, "There shall be included in the maintenance charge levied upon each lot the sum of $5.00 per month which amount shall be paid by the Developer to the entity which owns the golf course, marina, club house, and other recreational facilities." [1] When the Developer began the nineteenth subdivision in 1994, the recreational membership fee was $17.78 per month. That recreational membership fee, as well as the other portions of the maintenance charge, was secured by a vendor's lien reserved in the deed from the Developer to the purchaser of each lot.

On October 31, 1996, the Developer sold the Country Club to T.F.W. An operating agreement, executed the same day provided in part:

[The Developer] and [the Association] acknowledge and agree that TFW shall have the unrestricted right to assess, change, collect, receive, expend and administer, in its sole discretion, that portion of the maintenance charge referred to in the [RR & Cs] (the "Maintenance Charge") that relates to membership in the Recreational Facilities (the "Recreational Charge") subject to the rights, duties and limitations within the [RR & Cs]. WSI and [the Association] shall have no right to participate in setting the amount of the Recreational Charge nor to exempt any person, entity, or lot from the Recreational Charge without the consent of TFW which may be withheld in its sole discretion. The Recreational Charge shall, not withstanding [sic] any change in amount, remain secured by the vendor's lien referred to in the [RR & Cs].

... In the event of a delinquency regarding payment of the Maintenance Charge that remains outstanding for more than sixty (60) days and collection efforts are not being diligently pursued, TFW shall have the right, but not the obligation, to enforce the payment of the delinquent Maintenance Charge in the name of and on behalf of [the Association], including, without limitation, by institution of foreclosure proceedings.

The president of the Association signed the agreement.

Association By–Laws, also approved October 31, 1996, gave the Association power to do whatever it deemed "necessary or desirable" to maintain subdivision property "in neat and good order." Nevertheless,

---

1. Because the Developer was required to pay the recreational membership fee directly to the Country Club owner, and not to the Maintenance Fund, the RR & Cs for the eighteenth and nineteenth subdivisions, dated 1986 and 1994, read: "Except for the recreational charge ..., the maintenance charge collected shall be paid into the Maintenance Fund...."

nothing in the paragraph containing this provision, conferred "any right on the Association to take any action with respect to the recreational facilities owned by the Owner of the Recreational Facilities, which shall be owned, operated, managed, and maintained solely by the Owner of the Recreational Facilities."

The Developer transferred control of the Association on December 9, 1996. Before that date, no Association members, other than the initial Trustees, were entitled to a vote, and the business of the Association was managed by the Board of Trustees.[2]

On January 11, 1999, the Association wrote Williams requesting an accounting: "Inasmuch as the POA provides collections, allocations and delinquency information to the Country Club, on behalf of the owners we request that the Country Club provide an accounting to show the owners how their assessment money is being used." Williams did not respond, and the Association repeated the request on January 22. On January 28, Williams wrote:

In reference to how the dues are spent, we spend a percentage of each $31.25 a month each lot owner pays on the following: golf course equipment, golf course payroll, golf course supplies, pro shop payroll, administrative overhead, clubhouse upkeep, insurance, taxes, capital improvements, debt service, charitable contributions, swimming pool maintenance, tennis court maintenance, housekeeping, etc. and several other items.

In March 1999, the Association, through its attorney, wrote Williams, making one final demand for an accounting. The Association requested detailed information and documentation for calendar years 1997 and 1998. The Association based its request on the reference to the RR & Cs in the Operating Agreement and on an implied duty to furnish an accounting, "pursuant to well-settled case law." Williams responded through counsel, refusing to provide the requested information and arguing T.F.W. had no express, implied, or fiduciary duty to provide the information.

The Association sued T.F.W. (1) for an accounting, (2) for declaratory judgment seeking a "determination of its legal relations, responsibilities and rights with regard to the obligation of T.F.W. to expend maintenance charges in good faith to maintain or improve the property of the Subdivision" and "to define the obligations with which T.F.W. is charged concerning the operation of the recreational facilities for the benefit of the Subdivision and the request to account for its action to the residents," and (3) for breach of contract regarding maintenance of water in Westwood Lake.[3] T.F.W. answered with a general denial and counterclaimed for (1) breach of contract relating to the recreational charges and (2) trespass related to installation of utilities on the golf course.

The Association moved for partial summary judgment on its action for an accounting. It argued (1) a fiduciary duty exists between T.F.W. and the Association, and (2) the express terms of the RR & Cs create an implied contractual duty for T.F.W. to account for the expenditure of the funds collected from the Association's members. In support of its motion, the

2. According to the By Laws, "Each initial Trustee and their successors named in the Articles of Incorporation of the Association shall be a member so long as any Building Sites remain Unsold by the Developer unless sooner terminated by the Developer in its sole and absolute discretion."

3. The Association also sued Williams individually because T.F.W.'s charter had been revoked. Although the trial court did not order Williams to account to the Association, he joined in the notice of appeal.

Association provided, among other items, the RR & Cs from the nineteen subdivisions, correspondence between the Association and Williams regarding the Association's request for an accounting, and T.F.W.'s responses to the Association's request for production of T.F.W.'s financial records. T.F.W. responded, arguing (1) it has no express or implied duty to account under the terms of the documents governing the parties' relationship, and (2) no fiduciary duty exists between the parties. In support, it attached, among other items, Williams' affidavit and the Association's Amended By–Laws.

Without stating the grounds, the trial court granted the Association's motion and ordered T.F.W. to render an accounting. The Association then filed a motion to sever and abate the remaining causes of action. The trial court ultimately severed the remaining causes of action and rendered final judgment ordering an accounting in the case now before this court.

## DISCUSSION

### Nature of Case and Issues Presented

This case concerns an order for an accounting based on alleged contractual obligations and on principles of equity—not an accounting as a remedy sought in conjunction with another cause of action. *See Butler v. Cont'l Airlines, Inc.*, 31 S.W.3d 642, 646 n. 4 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) (noting parties stipulated plaintiff's claim for an accounting was remedy and not cause of action); *see also Michael v. Dyke*, 41 S.W.3d 746, 754 (Tex. App.-Corpus Christi 2001, no pet.) (observing action for accounting may be suit in equity, or it may be particular remedy sought in conjunction with another cause of action). The Association's breach of contract claim addressed the water level of the lake, not T.F.W.'s financial management of the recreational facilities. The Association admits it needs the accounting to determine *whether* there has been a breach of contract.

Nevertheless, under the trial court's order, a court-appointed auditor is to "render an accounting of the assessment, collection, and expenditure of all fees turned over to [T.F.W.] and its predecessor in interest by [the Association] on behalf of its members since October 1, 1996." The auditor is to have "access to all relevant books, records, accounts, and other documents, as determined by the auditor, in [the parties'] possession." In short, the Association has not alleged any wrongdoing by T.F.W. in relation to its financial records, and yet the trial court's order subjects T.W.F. to an intrusive and potentially expensive audit.

Although T.F.W. presents six issues for review, it presents essentially three arguments.[4] First, it contends the Association

---

4. T.F.W. lists the following six issues: (1) whether "TFW, a private Texas for profit corporation, must account to the [Association] for the assessment, collection, and expenditure of the recreational charges required to be paid to TFW for the Westwood Shores lot owners' access to TFW's recreational facilities and amenities"; (2) whether "the Operating Agreement between TFW and the POA [Property Owners' Association] or the Reservations, Restrictions, and Covenants [RR & Cs] for the Westwood Shores Development require TFW to account for the recreational charges"; (3) whether "TFW owes a fiduciary duty to the [Association]"; (4) whether "the trial court erred by considering the purported existence of a fiduciary relationship between TFW and the [Association] when the [Association] did not plead the existence of a fiduciary relationship or that it was entitled to an accounting on the basis of the existence of a fiduciary relationship"; (5) whether the Association "established as a matter of law that there was no adequate remedy at law to support an equitable action"; and (6) whether the Association "established as a matter of law, that there were no genuine issues of material fact

does not have a contractual right to an accounting. Second, it contends the Association cannot rely on a theory of a fiduciary relationship to obtain an accounting. Third, it argues the Association cannot meet the standards for an equitable accounting claim, specifically that the Association cannot show there is no adequate remedy at law. Relying on case law from foreign jurisdictions, the Association responds T.F.W. has a fiduciary duty and a contractual obligation to render an accounting to the Association. It also argues its original and unsuccessful attempt to obtain information through discovery establishes there is no adequate remedy at law. Because we conclude the Association cannot establish a contractual or fiduciary duty entitling it to an accounting, we hold the trial court erred in granting the Association's motion for summary judgment.

### Summary Judgment Standards

The movant for summary judgment has the burden to show there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *Nixon v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). When deciding whether there is a disputed material fact issue precluding summary judgment, the appellate court must take as true all evidence favorable to the non-movant. *Id.* at 548–49. The reviewing court must indulge every reasonable inference in favor of the non-movant and resolve any doubts in its favor. *Id.* at 549.

A plaintiff moving for summary judgment must conclusively prove all essential elements of its claim. *See MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex.1986); *Geiselman v. Cramer Fin. Group, Inc.*, 965 S.W.2d 532, 535 (Tex.App.-Houston [14th Dist.] 1997, no writ). Because the propri-

ety of summary judgment is a question of law, we review the trial court's decision *de novo*. *See Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex.1994). If, as here, the trial court grants a motion for summary judgment without stating the grounds on which it relied, we must affirm the summary judgment if any ground argued in the motion was sufficient. *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex.1995); *Blan v. Ali*, 7 S.W.3d 741, 747–48 (Tex.App.-Houston [14th Dist.] 1999, no pet.).

### Standards Applicable to a Suit for an Accounting

A suit for an accounting is generally founded in equity. *Southwest Livestock & Trucking Co. v. Dooley*, 884 S.W.2d 805, 809 (Tex.App.-San Antonio 1994, writ denied) (citing *Palmetto Lumber Co. v. Gibbs*, 124 Tex. 615, 80 S.W.2d 742, 748 (1935)). To be entitled to an accounting, a plaintiff usually must have a contractual or fiduciary relationship with the party from which the plaintiff seeks the accounting. *See Hunt Oil Co. v. Moore*, 656 S.W.2d 634, 642 (Tex.App.-Tyler 1983, writ ref'd n.r.e.) (holding mineral interest grantee, who acquired his interest after oil and gas lease between grantor lessor and oil company terminated, was not entitled to accounting from oil company when there was no contractual or fiduciary relationship between parties).

An equitable accounting is proper when the facts and accounts presented are so complex adequate relief may not be obtained at law. *Hutchings v. Chevron U.S.A.*, 862 S.W.2d 752, 762 (Tex.App.-El Paso 1993, writ denied) (citing *Richardson v. First Nat'l Life Ins. Co.*, 419 S.W.2d 836, 838 (Tex.1967)). When a party can obtain adequate relief at law through the use of standard discovery procedures, such

---

precluding summary judgment on its accounting claim." In relation to issue six, T.F.W. does not explain what disputed fact issues

exist in the Association's suit for an accounting.

as requests for production and interrogatories, a trial court does not err in not ordering an accounting. *See Hutchings,* 862 S.W.2d at 762.[5]

### No Implied Contractual Term under Texas Law

■ In its motion for summary judgment, the Association acknowledged there is no express contractual provision requiring T.F.W. to account to the Association. Instead, the Association argues the operating agreement and the deed restrictions create an implied duty to account.

In support, the Association relies almost exclusively on a case from the Maryland Court of Special Appeals, *P.V. Properties, Inc., v. Rock Creek Village Associates Limited Partnership,* 77 Md.App. 77, 549 A.2d 403 (1988).[6] In *P.V. Properties,* the court held "a tenant in a shopping center is entitled to an itemized listing of common area maintenance expenses where the lease is silent in that respect and the landlord is unwilling to provide the desired information." *Id.* at 404. As explained by the court, under the lease, the "landlord's right to charge the tenant for common area expenses is a limited one." *Id.* at 407. Specifically,

> The tenant has the right under the lease to be charged only for certain specific expenses incurred by the landlord for maintenance of the common areas.... Section 17.03 [of the lease] clearly delineates the charges for which the landlord can seek reimbursement from the tenant. The purpose in outlining these charges is to ensure that the landlord does not include other charges, such as capital improvements, to the tenants as part of their common area maintenance charges. Section 17.04 requires the landlord to provide the tenant with an annual statement reflecting its "total actual costs" of maintenance.

*Id.* at 407.

The *P.V. Properties* court concluded "the two sections read together, require

---

5.  Although the Association points to T.F.W.'s refusal to respond to its requests for production and interrogatories as evidence it has no adequate remedy a law, the Association's requests were broad, seeking, for example, (1) "[a]ny and all financial books and records of the Corporation showing all receipts, expenditures, disbursements, assets, liabilities, profits and losses of the Corporation," (2) "[a]ny and all financial records necessary for the recording of the business and affairs of the Corporation," (3) "[a]ny and all financial documents and/or information [the Corporation] is required to maintain pursuant to Texas law concerning the operation of the Corporation," (4) "[a]ny and all balance sheets and profit and loss statements of the Corporation," (5) "[a]ny and all documentation and/or other tangible media evidencing any outstanding notes which the Corporation owes to any individual entity," (6) "[a]ny and all documentation and/or other tangible media evidencing any outstanding notes which are payable to the Corporation by any individual entity," (7) "[a]ny and all documentation and/or other tangible media evidencing the current standing of the corporate status of the Corporation," and (8) "[a]ny and all documentation and/or other tangible media evidencing any business ventures other than the Westwood Shores Country Club of the Corporation, its officers, directors or any Insider or principal."

6.  The Association also cites two treatises on contracts and the following two Dallas cases: *Cockrell v. Republic Mortgage Ins. Co.,* 817 S.W.2d 106 (Tex.App.-Dallas 1991, no writ), and *Dedier v. Grossman,* 454 S.W.2d 231 (Tex. Civ.App.-Dallas 1970, writ ref'd n.r.e.). In *Cockrell,* the court observed, "Absent an *Arnold* 'special relationship,' the duty to act in good faith is contractual in nature and its breach does not amount to an independent tort." 817 S.W.2d at 116 (referring to *Arnold v. Nat'l County Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex.1987)). In *Dedier,* the court stated, "Absent fraud or mistake the court will not make a new contract for the parties or add to, modify, or change in any particular the agreement that they have made." 454 S.W.2d at 235.

the landlord to provide the tenant with an annual statement which outlines in detail the type and amount of each expense it incurred." *Id.* at 407–08. The court also observed the requirement to itemize the common area maintenance expenses could be "*implied* from the terms of the lease." *Id.* at 408.

Unlike the lease in *P.V. Properties,* the operating agreement in the present case gives T.F.W. "in its sole discretion," an "unrestricted right to assess, change, collect, receive, expend and administer" the recreational facilities charge. Although the operating agreement subjects that discretion to "the rights, duties and limitations within the [RR & Cs]," the Association's own by-laws provide the recreational facilities are to "be owned, operated, managed, and maintained solely by the Owner of the Recreational Facilities." Finally, the RR & Cs provide the recreational facilities charge "is to be paid ... to the entity which owns the [recreational facilities]," thereby differentiating that charge from other portions of the maintenance charge, which apparently remain in the maintenance fund. The contractual provisions at issue in the present case are distinguishable from those in *P.V. Properties.*

The law on which the *P.V. Properties* court relied to imply a requirement to itemize is distinguishable from Texas law. The *P.V. Properties* court observed, "The obligation of *good faith and cooperation implied in every contract* gives rise to the implied requirement on the part of the landlord to disclose its cost data and the basis upon which the tenant's common area maintenance liability was computed." *Id.* (emphasis added). Texas, however, has specifically rejected the implication of a general duty of good faith and fair dealing in all contracts. *City of Midland v. O'Bryant,* 18 S.W.3d 209, 215 (Tex.2000).

The Association has cited no Texas cases that imply, in a contract otherwise silent on the matter, a contractual provision for an accounting under facts similar to those in the present case. We have found none. Accordingly, we will not imply such a requirement here. *See Emscor Mfg., Inc. v. Alliance Ins. Group,* 879 S.W.2d 894, 910 (Tex.App.-Houston [14th Dist] 1994, writ denied) (stating "[i]t is not for an intermediate appellate court to create new causes of action"); *see also Hughes Drilling Fluids, Inc., Div. of Hughes Tool Co. v. Eubanks,* 729 S.W.2d 759, 762 (Tex.App.-Houston [14th Dist.] 1986, writ granted) (stating decision to extend right of recovery in loss of parental consortium cases lies with legislature or supreme court), *set aside pending settlement,* 742 S.W.2d 275 (Tex.1987).

### No Limited Fiduciary Duty under Texas Law

■ As this court explained in *Chapman Children's Trust v. Porter & Hedges, L.L.P.,*

> There are two types of fiduciary relationships. The first is a formal fiduciary relationship in which a duty arises as a matter of law, including those between an attorney and client, a principal and agent, a trustee and beneficiary, and partners in a partnership.... The second is an informal fiduciary relationship, which may arise "from a moral, social, domestic or purely personal relationship ... called a confidential relationship."

32 S.W.3d 429, 439 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (citations omitted).

The Association does not contend a formal fiduciary relationship exists between it and T.F.W. As it did in its motion for summary judgment, the Association argues a limited fiduciary relationship exists because special confidence is reposed on

one side and there is resulting domination and influence on the other.

In support, the Association cites *Richardson*. In *Richardson*, the supreme court explained the equitable relief of an accounting may be granted when there is a *close* fiduciary relationship. 419 S.W.2d at 838. The issue in *Richardson*, however, was whether the district court had jurisdiction over a suit in which the plaintiff sought judgment in an amount less than the jurisdictional limit of the district court. *Id.* The supreme court observed the only way it could sustain the district court's jurisdiction would be to hold the suit was one in equity, and the supreme court declined to do so. *Id.* at 838–39.

The Association also cites several cases dealing with the criteria for establishing the existence of an informal fiduciary or confidential relationship. *See, e.g., Pope v. Darcey*, 667 S.W.2d 270, 275 (Tex.App.-Houston [14th Dist.] 1984, writ ref'd n.r.e.) (stating confidential relationship exists when one person has special confidence in another to extent that parties do not deal with each other equally, either because of dominance on one side or weakness, dependence, or justifiable trust on the other; and holding fiduciary relationship existed between attorney representing estate and heir of deceased from whom attorney sought to purchase heir's 1/5th share of inheritance); *Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 508–09 (Tex.1980) (stating "accepted rule" that, when trust is reposed and substantial benefits are gained, equity will recognize beneficiary of transaction is a fiduciary and under fiducial obligation of establishing fairness of transaction to his principal; and holding fiduciary relationship existed between administrator of decedent's estate and decedent's nephew, who had accepted transfers by his aunt to him as joint tenant with survivorship rights); *Fitz–Gerald v. Hull*, 150 Tex. 39, 237 S.W.2d 256, 261–62 (1951) (discussing principles underlying imposition of constructive trust in context of case involving joint-adventurers,).

The Association, however, cites no Texas cases creating a fiduciary duty to provide an accounting under facts similar to those in the present case, and we have found none. Accordingly, we decline to create such a new duty here. *See Emscor Mfg.*, 879 S.W.2d at 910 (stating, "It is not for an intermediate appellate court to create new causes of action"); *see also Hughes Drilling Fluids*, 729 S.W.2d at 762 (stating decision to extend right of recovery in loss of parental consortium cases lies with legislature or supreme court).

## CONCLUSION

Because we conclude there is no implied contractual, or limited fiduciary, duty for T.F.W. to provide the Association with an accounting, we sustain T.F.W.'s issues two and three, which directly raise these questions. Because of our resolution of issues two and three, we reverse the judgment in favor of the Association on these grounds and need not address T.F.W.'s remaining issues.

We reverse the judgment of the trial court and remand the case for further proceedings consistent with this opinion.

BRISTER, C.J., concurring.

SCOTT BRISTER, Chief Justice, concurring.

I agree with the Court's disposition, and its reticence to rewrite the homeowners' contracts or create a new fiduciary duty to accommodate them. But because of the potential abuse in the type of development plan used in this case, I would leave some room to address these questions further in the future, and decide this case on another ground.

The homeowners here are being taxed without representation. The privately-owned corporation that manages the golf club has the right to assess any maintenance charge it chooses, and payment is secured by a vendor's lien on each home that may be foreclosed if the charge is not paid. The homeowners never agreed to this; the developer made the arrangement on behalf of the association while he still controlled it. Perhaps the homeowners might have foreseen the possibility from the deed restrictions, but only if they were lawyers trained to assume that every contractual clause would be taken to its most logically horrible conclusion.

Nevertheless, the homeowners do not allege exorbitant assessments or a spate of foreclosures in this case. Instead, they allege disagreements with how the golf club is being run, and seek an equitable accounting to confirm or allay their suspicions.

But an equitable accounting is proper only when normal discovery procedures are inadequate. *Hutchings v. Chevron U.S.A.*, 862 S.W.2d 752, 762 (Tex.App.-El Paso 1993, writ denied). There is no such showing in this record. The Court correctly concludes that the homeowners' discovery requests were impossibly over-broad, and the trial court jumped over them to the accounting remedy. This was the error.

Whether we should imply a right to an accounting or some other term in these parties' relationship is a more complicated question. While courts rarely imply terms in a contract, we may do so when the parties so clearly understood a matter they deemed it unnecessary to express it, or a term must be implied to effectuate the full purpose of the contract. *See Fein v. R.P.H., Inc.*, 68 S.W.3d 260, 268 (Tex.App.-Houston [14th Dist.] 2002, pet. denied). The structure of this relationship and po-

tential loss of one's home might require us to reconsider today's conclusion. But the facts in our record do not warrant any extraordinary intervention here. Thus, I agree the trial court's judgment should be reversed and remanded for further proceedings.