Affirmed and Opinion filed September 28, 2004









Affirmed and Opinion filed September 28, 2004.

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-03-00661-CV

____________

 

BEVERLY
LOIS TAYLOR AND JEFFREY D. TAYLOR, INDIVIDUALLY 

AND AS NEXT FRIENDS FOR JAMES TAYLOR, JOSHUA TAYLOR, 

JACOB TAYLOR, AND HANNAH TAYLOR, MINORS, 

AND JEFFREY D. TAYLOR, JR., Appellants

 

V.

 

JOHN W.
CARLEY, Appellee

___________________________________________________________

 

On Appeal from the 190th District Court

Harris County, Texas

Trial Court Cause No. 01-01129A

___________________________________________________________

 

O P I N I O N








This case presents a dispute
between a psychologist and his former patient. 
We must determine (1) whether the psychologist=s alleged
negligent diagnosis caused the patient=s injury,
and (2) whether the psychologist, who had referred the patient to a
psychiatrist and who was no longer seeing the patient, had a duty to monitor
her progress.  Appellants/plaintiffs
Beverly Lois Taylor and Jeffrey D. Taylor, individually and as next friends for
James Taylor, Joshua Taylor, Jacob Taylor, and Hannah Taylor, minors, and
Jeffrey D. Taylor, Jr., sued appellee/defendant John W. Carley, Ph.D., a
psychologist, alleging that Dr. Carley negligently misdiagnosed Beverly Taylor=s
condition and failed to follow her symptoms after referring her to a
psychiatrist.  Dr. Carley moved for
summary judgment on traditional and no-evidence grounds, and the trial court
granted the motion.  We conclude (1)
there is no evidence that Dr. Carley=s alleged
negligence in diagnosing Mrs. Taylor proximately caused her injury, and (2) Dr.
Carley had no duty to follow or monitor Mrs. Taylor=s
condition after she stopped seeing him. 
Accordingly, we affirm.

I.  Factual
and Procedural Background

Mrs. Taylor=s first
appointment with Dr. Carley occurred in September 1998.  Mrs. Taylor consulted with him because she
had just returned to full-time work outside the home, was experiencing feelings
of anxiety, and having problems in her marriage.  In the course of her treatment with Dr.
Carley, Mrs. Taylor discussed her oldest son=s
attention deficit/hyperactivity disorder (AADHD@).  Dr. Carley eventually had Mrs. Taylor take
some computerized tests, which, according to Mrs. Taylor, Dr. Carley said were
to test for possible ADHD.  Toward the
end of his sessions with Mrs. Taylor, Dr. Carley diagnosed her as having attention
deficit disorder (AADD@), not
hyperactivity, as well as other conditions.[1]  Dr. Carley told Mrs. Taylor he wanted a
psychiatrist or other medical doctor to evaluate her and determine what her
medication needs might be.  

Dr. Carley told Mrs. Taylor about
Dr. John Steffek, a psychiatrist who rented office space from Dr. Carley and
saw patients at that location one day a week. 
Dr. Carley advised Mrs. Taylor that Dr. Steffek generally treated
adolescents and children.  Mrs. Taylor
knew she was free to see any psychiatrist or other medical doctor she chose,
but made her independent choice to consult with Dr. Steffek.








Dr. Steffek met with Mrs. Taylor
in mid-December 1998.  At that time, they
talked about multiple issues to clarify or rule out a diagnosis of ADHD.  Before meeting Mrs. Taylor, Dr. Steffek had
access to Mrs. Taylor=s history
from Dr. Carley, but Dr. Steffek had not arrived at the conclusion that Mrs. Taylor
had ADHD.  Based on his interaction with
Mrs. Taylor and having her talk about questions on a printed page he gave her,
Dr. Steffek concluded Mrs. Taylor exhibited seven of nine phenomena for a
diagnosis of ADHD, inattentive type.[2]  This was one of Dr. Steffek=s three
final diagnoses, the other two being generalized anxiety disorder and mixed
personality with compulsive, dependent features. 

Dr. Steffek told Mrs. Taylor she
needed to undergo blood tests, a urinalysis, and an electrocardiogram before he
could prescribe medication.  Mrs. Taylor
completed the blood tests and the urinalysis, but did not have the
electrocardiogram.  According to Mrs.
Taylor, she chose not to have the electrocardiogram because she was busy
working and had five children.  Dr.
Steffek subsequently told Mrs. Taylor she did not need the electrocardiogram
because the results of the laboratory work were favorable.  Dr. Steffek then gave Mrs. Taylor Dexedrine
tablets and told her to try them and also to redo the computer test with Dr.
Carley after taking the Dexedrine.  Mrs.
Taylor reported that her husband was seeing a difference in her behavior, and
the results of the re-test also showed improvement after the Dexedrine.








In mid-January 1999, Dr. Steffek
first prescribed Adderall for Mrs. Taylor.[3]  Dr. Steffek would write the prescriptions one
way, but give Mrs. Taylor different directions for taking the medication.[4]  Dr. Steffek also instructed Mrs. Taylor to
gradually increase the dose, determine how she would feel, and determine
whether she had any of the side-effects that typically appear with this
medication.  If there were no
side-effects and functioning was not optimal, Mrs. Taylor was to increase the
first dose of the day to attempt to get a more beneficial response.  Mrs. Taylor saw Dr. Steffek again in
mid-February 1999, and saw him every two months thereafter.  According to Mrs. Taylor, sometime around
April 1999, she started experiencing headaches and weight loss and reported
these symptoms to Dr. Steffek.  There is
some evidence that, at one point, Mrs. Taylor was taking twenty milligrams of
Adderall in the morning and twenty in the afternoon, but that was subsequently
reduced to fifteen milligrams in the morning and ten in the afternoon.[5]  Dr. Steffek never checked Mrs. Taylor=s blood
pressure while she was under his care.

According to Mrs. Taylor, she saw
Dr. Carley two times after she started taking the Adderall, the second occasion
being February 23, 1999.  Mrs. Taylor did
not report any problems with the medications or side effects to Dr.
Carley.  At the February 23 visit, Mrs.
Taylor reported to Dr. Carley that she was Adoing
well.@  Mrs. Taylor then started missing appointments
with Dr. Carley.  Dr. Carley wanted Mrs.
Taylor to reschedule the missed appointments, but Mrs. Taylor explained to him
she could not do so because she could not be missing two or three days a week
going to appointments for two different doctors.  By the time Mrs. Taylor started experiencing
headaches and weight loss, she had stopped seeing Dr. Carley.








Mrs. Taylor testified that by
September 1999, she was taking fifteen milligrams of Adderall in the morning
and ten milligrams in the afternoon.  On
September 24, 1999, Mrs. Taylor was hospitalized with Asudden
onset of confusional state, headache, and agitation.@  Two computered tomography scans performed
that day were normal.  According to her
medical record, Mrs. Taylor=s Apresentation,
especially the presence of hypertension and mild tachycardia, was suspected of
amphetamine toxicity.@[6]  Magnetic resonance imaging (AMRI@) was
performed the following days.  Repeat
MRIs showed ischemia (restricted blood flow) of the upper medullary
region.  Mrs. Taylor had suffered a
stroke.  

Mrs. Taylor and her husband sued
Dr. Carley, Dr. Steffek, three Walgreen entities, and the manufacturer and
supplier of Adderral.[7]  The Taylors alleged Dr. Carley was negligent
in (1) failing to assess and evaluate Mrs. Taylor=s status
and response to medical treatment and to report such findings to the physician;
(2) failing to assess and diagnose Mrs. Taylor=s
condition accurately; (3) failing to assess the true extent of the symptoms
from which Mrs. Taylor was suffering; (4) failing, on Mrs. Taylor=s
subsequent visits, to perform an assessment of the side-effects of the
prescribed Adderall; (5) ignoring Mrs. Taylor=s reports
of symptoms associated with side-effects from the prescribed Adderall; and (6)
deviating from the standard of care for a psychologist treating a patient with
complaints like Mrs. Taylor=s.

Dr. Carley moved for summary
judgment on traditional and no-evidence grounds.  He alleged he was entitled to summary
judgment as a matter of law because he owed no duty to Mrs. Taylor to:

(1)       assess and evaluate Mrs. Taylor=s status and response to
medical treatment and to report such findings to the physician;








(2)       accurately assess and diagnose Mrs.
Taylor=s condition Afor purposes of evaluating
her need for medication, contraindications to any medication, such as Adderall,
side effects of  [sic] symptoms
associated with that medication@; 

(3)       assess the true extent of the symptoms Mrs.
Taylor was suffering Aas it relates to symptoms
[Mrs. Taylor] claims to have sustained as a result of taking Adderall@; and

(4)       to perform an assessment of the
side-effects of the prescribed Adderall on Mrs. Taylor=s subsequent visits.

 

In the trial court, Dr. Carley argued the
uncontroverted evidence established he was a psychologist, not a psychiatrist,
and as such, he had a duty to evaluate Mrs. Taylor=s
psychological symptoms Afor the
purposes of providing counseling, but not for the purposes of determining
whether medication is required or whether [Mrs. Taylor] is having adverse
symptoms, resulting from use of Adderall.@  He argued there was no breach of duty because
the evidence established Mrs. Taylor never complained to Dr. Carley of Aany
symptoms, side effects, or adverse consequences, whatsoever, whether related to
the Adderall or not.@  Finally, Dr. Carley argued there was no
causation because, although Mrs. Taylor might raise issues about the adequacy
of his note-taking, the accuracy of his diagnosis, or the adequacy of his
counseling, none of these acts or omissions could have proximately caused Mrs.
Taylor=s stroke,
which she claimed resulted solely from taking the Adderall.  Dr. Carley also pointed to Dr. Steffek=s
testimony that Dr. Steffek had prescribed the Adderall and had not relied on
Dr. Carley=s notes, treatment, or diagnosis
in deciding to prescribe the medication to Mrs. Taylor.  In support of the traditional motion for
summary judgment, Dr. Carley attached his own deposition testimony and that of
Mrs. Taylor and Dr. Steffek.

Dr. Carley also moved for
no-evidence summary judgment under Texas Rule of Civil Procedure 166a(i),
alleging there was no evidence as to duty, breach of duty, or proximate
cause.  He specifically asserted:








Particularly, there is no evidence that Dr. Carley
prescribed Adderall to Beverly Taylor; there is no evidence that Dr. Steffeck
[sic] based his decision to prescribe Adderall to Beverly Taylor in whole or in
part on Dr. Carley=s findings or diagnosis of ADHD; there is no evidence
that Dr. Carley knew or should have known of the potential adverse consequences
of the drug Adderall upon Mrs. Taylor; there is no evidence that Dr. Carley
knew or should have known of adverse symptoms or effects suffered by Mrs.
Taylor following prescription of the Adderall; there is no evidence that Dr.
Carley=s acts or omissions, if any, proximately caused the
damages she complains of, all of which arose or are derived from her claim that
she sustained a stroke as a result of taking Adderall.

 

The Taylors responded to the
summary judgment motions and also objected to Dr. Carley=s
reliance on the depositions of Dr. Steffek and Dr. Carley because both
individuals were interested parties.  The
Taylors= own
summary-judgment evidence consisted of (1) excerpts from the depositions of Dr.
Carley, Dr. Steffek, and Mrs. Taylor, (2) an affidavit from Ron Kimball, Ph.D.,
who had reviewed Dr. Carley=s chart
notes for Mrs. Taylor, (3) a letter from Mitchell S. Felder, M.D., Mrs. Taylor=s
psychiatrist expert, and (4) Northeast Medical Center Hospital=s
discharge summary for Mrs. Taylor.  The
Taylors attempted to adduce evidence regarding duty solely by pointing to the
uncontroverted evidence that Mrs. Taylor was Dr. Carley=s
patient.








The Taylors attempted to raise a
genuine fact issue regarding the breach-of-duty element by referring to Dr.
Kimball=s affidavit.  Dr. Kimball criticized the incompleteness of
Dr. Carley=s notes, and opined that Dr.
Carley had violated the standards of care by (1) using an inappropriate
technique (biofeedback) to assess ADHD in an adult; (2) using a standard
psychological battery not considered reliable in evaluating possible Axis I
disorders (anxiety disorder); and (3) never completing a formal process of
diagnosis.  Regarding breach of duty,
Mrs. Taylor also relied on Dr. Carley=s
deposition testimony that (1) he had made the diagnosis of ADD; (2) ADD had to
have been present before age seven; (3) Mrs. Taylor had not previously been
diagnosed with ADD; and (4) Mrs. Taylor did not have hyperactivity (required
for ADHD).

Finally, the Taylors attempted to
raise a genuine fact issue regarding the causation element by referring to the
following events: (1) Adderall was prescribed for Mrs. Taylor=s
misdiagnosed ADD; (2) Mrs. Taylor was self-monitoring whether she was achieving
therapeutic levels of Adderall, which can cause the precursor to a stroke by
elevating blood pressure; (3) Dr. Steffek and Dr. Carley referred patients to
each other; (4) Dr. Steffek was renting office space from Dr. Carley and
treated Mrs. Taylor at that location; (5) Dr. Steffek and Dr. Carley would
discuss mutual patients, of which Mrs. Taylor was one; and (6) Dr. Carley knew
about Mrs. Taylor=s
Adderall prescription.  Mrs. Taylor also
alleged, APlaintiff [Mrs.] Taylor=s
neurologist upon admittance at Northeast Medical Center Hospital, Dr. Massoud
Bina, suspected that her stroke was due to amphetamine toxicity.  Further, it is Plaintiff=s
psychiatrist expert=s opinion
that the high dosage of Adderall prescribed by Dr. Steffek caused [Mrs.] Taylor=s stroke.@[8]

Without stating the grounds, the
trial court granted Dr. Carley=s
summary-judgment motion on all claims the Taylors asserted against him.  The trial court subsequently severed the
claims against Dr. Carley from the Taylors= claims
against the remaining defendants, thus making the judgment final as to Dr.
Carley.

II.  Issue
Presented and Standard of Review








In a single issue the Taylors
allege the trial court erred in granting summary judgment on unspecified
grounds when the summary-judgment evidence established that Dr. Carley owed
Mrs. Taylor a duty arising from the psychologist-patient relationship as a matter
of law and, at a minimum, raised fact issues regarding (1) whether Dr. Carley
breached that alleged duty by misdiagnosing Mrs. Taylor=s
condition, and (2) whether Mrs. Taylor suffered damages as a result of medication
prescribed by the psychiatrist to whom Dr. Carley referred Mrs. Taylor in
foreseeable reliance on the alleged misdiagnosis.  

In reviewing a traditional motion
for summary judgment, we take as true all evidence favorable to the non‑movant,
and we make all reasonable inferences in the non‑movant's favor.  Dolcefino v. Randolph, 19 S.W.3d 906,
916 (Tex. App.CHouston [14th Dist.] 2000, pet.
denied).  If the movant=s motion
and summary‑judgment evidence facially establish its right to judgment as
a matter of law, the burden shifts to the non‑movant to raise a genuine,
material fact issue sufficient to defeat summary judgment.  Id. 

In reviewing a no‑evidence
motion for summary judgment, we ascertain whether the non‑movant produced
any evidence of probative force to raise a genuine issue of fact as to the
essential elements attacked in the no‑evidence motion.  Id. We take as true all evidence
favorable to the non‑movant, and we make all reasonable inferences
therefrom in the non‑movant=s
favor.  Id. A no‑evidence
motion for summary judgment must be granted if the party opposing the motion
does not respond with competent summary‑judgment evidence that raises a
genuine issue of material fact.  Id.
at 917.  When the trial court does not
specify the grounds for its ruling, we affirm if any of the grounds advanced in
the motion has merit.  See Carr v.
Brasher, 776 S.W.2d 567, 569 (Tex. 1989). 
Because Dr. Carley moved for summary judgment on both traditional and
no-evidence grounds and the trial court did not specify which it granted, we
can uphold the summary judgment on either ground.  See Bruce v. K.K.B., Inc., 52 S.W.3d
250, 254 (Tex. App.CCorpus
Christi 2001, pet. denied); see also FNFS, Ltd. v. Sec. State Bank &
Trust, 63 S.W.3d
546, 548 (Tex. App.CAustin
2001, pet. denied); Barraza v. Eureka Co., 25 S.W.3d 225, 231 (Tex. AppCEl Paso
2000, pet. denied).

III.  Analysis

A.  The
Taylors= Assertions and General
Negligence Elements








The Taylors contend Dr. Carley
was negligent in two ways: (1) misdiagnosing Mrs. Taylor=s
condition, and (2) failing to monitor the side-effects of the Adderall, which
Dr. Steffek prescribed.[9]  The elements of a negligence claim are
existence of a legal duty, a breach of that duty, and damages proximately
caused by the breach.  IHS Cedars
Treatment Ctr. of DeSoto, Texas, Inc. v. Mason, No. 01-0926, 47 Tex. Sup.
Ct. J. 666, 668, 2004 WL 1396194, at *3 (Tex. June 18, 2004).  The threshold inquiry is duty.  Centeq Realty, Inc. v. Siegler, 899
S.W.2d 195, 197 (Tex. 1995).  The
existence of a duty is a question of law for the court to decide from the facts
surrounding the occurrence in question.  Walker v. Harris, 924 S.W.2d 375, 377
(Tex. 1996).

B. 
Proximate Cause and Dr. Carley=s Alleged
Misdiagnosis

A reviewing court may assume the
existence of a duty and resolve the appeal on the basis of one of the other
elements, such as proximate cause.  See
Mason, 47 Tex. S. Ct. J. at 666, 2004 WL 1396194, at *1 (doing so in
context of reviewing summary judgment). 
The two elements of proximate cause are cause in fact and foreseeability.
Mason, 47 Tex. S. Ct. J. at 668, 2004 WL 1396194, at *3.  These elements cannot be satisfied by mere
conjecture, guess, or speculation.  Id.









ACause in
fact is established when the act or omission was a substantial factor in
bringing about the injuries, and without it, the harm would not have occurred.@  Id. 
That the harm would not have occurred without an actor=s
negligence is a necessary, but not sufficient, factor.  See id.  Thus, cause in fact is not established when a
defendant=s negligence does no more than
furnish a condition that makes the injuries possible.  Id. 
AThe
evidence must go further, and show that such negligence was the proximate, and
not the remote, cause of resulting injuries . . . 
[and] justify the conclusion that such injury was the natural and probable
result thereof.@  Doe v. Boys Clubs of Greater Dallas, Inc.,
907 S.W.2d 472, 477 (Tex. 1995) (quotations omitted).  Accordingly, even if an injury would not have
happened but for the defendant=s
conduct, the connection between the defendant and the plaintiff=s
injuries simply may be too attenuated to constitute legal cause.  Id. 

Foreseeability means the actor, as a person of
ordinary intelligence, should have anticipated the dangers his negligent act
created for others.  Travis v. City of
Mesquite, 830 S.W.2d 94, 98 (Tex. 1992). 
Foreseeability, however, does not require a person to anticipate the
precise manner in which injury will occur once the person creates a dangerous
situation through his negligence.  Ambrosio
v. Carter=s
Shooting Ctr., Inc., 20 S.W.3d 262, 265 (Tex. App.CHouston
[14th Dist.] 2000, pet. denied). 
Foreseeability requires only that the general danger, not the exact
sequence of events that produced the harm, be foreseeable.  Id.

When events intervene between the alleged
negligent act and the injury, a question may arise whether such events
constitute superseding causes that break the causal connection between the act
and the injury.  As the San Antonio Court
of Appeals has explained:

Texas courts distinguish between a new and independent cause and a
concurrent act.  A concurrent act
cooperates with the original act in bringing about the injury and does not cut
off the liability of the original actor. 
A Anew and independent cause,@ sometimes referred to as
a superseding cause, however, is an act or omission of a separate and
independent agency that destroys the causal connection between the negligent
act or omission of the defendant and the injury complained of, and thereby
becomes the immediate cause of such injury.

 

Benitz v. Gould Group, 27 S.W.3d 109, 116 (Tex. App.CSan
Antonio 2000, no pet.) (citations omitted).

In determining whether an intervening force rises
to the level of a superseding cause, Texas courts consider the following six
factors:  

(1)       the fact the intervening force brings about harm different in
kind from that which would otherwise have resulted from the actor=s negligence; 

 








(2)       the fact the intervening force=s operation or its
consequences appear after the event to be extraordinary, rather than normal, in
view of the circumstances existing at the time of the force=s operation; 

(3)       the fact the intervening force is operating independently of
any situation created by the actor=s negligence or is not a
normal result of such a situation; 

(4)       the fact the operation of the intervening force is due to a
third person=s act or to his failure to
act; 

(5)       the fact the intervening force is due to an act of a third
person that is wrongful toward the other and thus subjects the third person to
liability to him; and 

(6)       the degree of
culpability of a wrongful act of a third person which sets the intervening
force in motion.  

See Phan Son Van v. Pena, 990 S.W.2d 751, 754 (Tex.
1999).  The issue of new and independent
cause is a component of the ultimate issue of proximate cause and not an
affirmative defense.  Rodriguez v.
Moerbe, 963 S.W.2d 808, 821 n.12 (Tex. App.CSan
Antonio 1998, pet. denied).








In the present case, the Taylors alleged the
following causal chain: (1) Dr. Carley misdiagnosed Mrs. Taylor as having
ADD/ADHD; (2) Dr. Carley then referred Mrs. Taylor to Dr. Steffek; (3) Dr.
Steffek also misdiagnosed Mrs. Taylor as having ADD/ADHD; (4) Dr. Steffek
prescribed Adderall for Mrs. Taylor=s
condition and had Mrs. Taylor self-monitor the effects of the medication; (5)
Mrs. Taylor took more than the recommended dose of Adderall; and (6) the
Adderall caused Mrs. Taylor to have adverse side effects and eventually suffer
a stroke.  Thus, according to the Taylors=
allegations, at least three events intervened between Dr. Carley=s
diagnosis and Mrs. Taylor=s stroke:
(1) Dr. Steffek=s
independent diagnosis; (2) Dr. Steffek=s
prescription of the Adderal; and (3) Mrs. Taylor=s taking
more than the recommended dose of the medication.  As alleged, the intervening acts implicated,
at a minimum, factors three (independent action of intervening force), four
(operation of intervening force as a result of a third person=s act),
five (wrongfulness of third person=s act),
and six (degree of culpability of third person) of the six superseding-cause
criteria set forth above.

In the no-evidence part of his summary-judgment
motion Dr. Carley contended there was no evidence of proximate cause.  Dr. Carley specifically alleged, among other
things, that there was no evidence (1) Dr. Carley prescribed Adderall to Mrs.
Taylor; (2) Dr. Steffek based his decision to prescribe Adderall to Mrs. Taylor
in whole or in part on Dr. Carley=s
findings or diagnosis of ADHD; (3) Dr. Carley knew or should have known of the
potential adverse consequences of the drug Adderall upon Mrs. Taylor; and (4)
Dr. Carley knew or should have known of adverse symptoms or effects suffered by
Mrs. Taylor following her taking of this medication.[10]  Thus, Dr. Carley=s
no-evidence allegations particularly challenged the Taylors to produce proof of
the foreseeability component of proximate cause.

In response, the Taylors presented
summary-judgment evidence, which they summarized as follows:








Adderall is
an amphetamine and a Schedule II narcotic which can become addictive.  Beverly Taylor was reporting headaches and
weight loss to Defendant Steffek. 
Beverly Taylor was subscribed [sic] Adderall for her misdiagnosed
ADD.  She was self monitoring whether she
was achieving therapeutic levels. 
Adderall can cause the precursor to a stroke by elevating her blood
pressure.  Defendant Steffek treated
patients, including Beverly Taylor, at Dr. Carley=s office
on Thursdays.  Dr. Steffek was renting
space from Dr. Carley.  They would refer
patients to each other.  Dr. Steffek has
referred ADHD patients to Dr. Carley before. 
When Dr. Steffek was in Dr. Carley=s office
on Thursday=s [sic] he would sit down and have a conversation
about their mutual patients.  Beverly
Taylor was a mutual patient.[11]  Dr. Carley knew she was being prescribed
Adderall.[12]  Dr. Carley=s breach
of the standard of care in making the diagnosis of ADD and referring her for
medication treatment was a cause of the ultimate damages and injuries sustained
by the Plaintiffs herein.[13]  Plaintiff Taylor=s neurologist upon admittance at Northeast Medical
Center Hospital, Dr. Massoud Bina, suspected that her stroke was due to
amphetamine toxicity.  Further, it is Plaintiff=s psychiatrist expert=s
opinion that the high dosage of Adderall prescribed by Dr. Steffek caused
Beverly Taylor=s stroke.[14]  Adderall would not have been prescribed if
her anxiety disorder had not been misdiagnosed by Dr. Carley.[15]  (original footnotes deleted; present
footnotes added by this court.)

 








The
Taylors have not produced any summary-judgment evidence showing (1) that Dr.
Steffek based his decision and treatment on Dr. Carley=s
diagnosis, or (2) that Dr. Carley knew or should have known of the potential
adverse consequences of Adderall on Mrs. Taylor.  In light of Dr. Steffek=s and
Mrs. Taylor=s roles in the chain of events
and the lack of evidence that Dr. Steffek=s
allegedly wrongful act was a concurrent act, as opposed to a new and
independent cause, Mrs. Taylor=s
summary-judgment evidence is insufficient to raise a genuine issue of fact on
the element of proximate cause.

At oral argument, the Taylors directed this court=s
attention to Benitz, 27 S.W.3d at 116B17 and Wilson
v. Brister, 982 S.W.2d 42, 44B45 (Tex.
App.CHouston
[1st Dist.] 1998, pet. denied).  In those
cases, the appellate courts were reviewing the grant of traditional summary
judgment motions in which the defendants shouldered the burden of conclusively
proving the presence of a superseding cause. 
See Benitz, 27 S.W.3d at 117; Wilson, 982 S.W.2d at
45.  They are not persuasive authority
for deciding the appropriateness of a no-evidence summary judgment in the
present case.  See Phan Son Van,
990 S.W.2d at 753 n.2 (stating, if defendant moves for no-evidence summary judgment
based on lack of foreseeability, it will be plaintiff=s burden
to provide summary-judgment evidence of foreseeability).

C.        Duty and Dr. Carley=s Alleged Failure to
Monitor Mrs. Taylor=s Reaction to Adderall

 

Mrs. Taylor contends Dr. Carley had a duty to
monitor Mrs. Taylor=s
progress on the medication Adderall and to report his impressions to Dr.
Steffek.  According to Mrs. Taylor=s
deposition testimony, she saw Dr. Carley only twice after she began taking the
Adderall.  She did not tell Dr. Carley
about any problems with medications or side effects.  At the second visit, she told Dr. Carley she
was Adoing
well.@  When she started experiencing headaches and
weight loss, she was no longer seeing Dr. Carley.








The narrow question in this case, therefore, is
whether a psychologist has a duty to monitor or follow the progress of a former
patient who is no longer seeing the psychologist but is seeing a physician to
whom the psychologist referred the patient. 
The Taylors cite no authority to support such a duty, and we have found
none.  We decline to create a new duty
not recognized by Texas law.  See
T.F.W. Mgmt., Inc. v. Westwood Shores Prop. Owners Ass=n, 79 S.W.3d
712, 720 (Tex. App.CHouston
[14th Dist.] 2002, pet. denied).

IV.  Conclusion

Having concluded that there is no evidence Dr.
Carley=s alleged
negligence in diagnosing Mrs. Taylor proximately caused Mrs. Taylor=s injury
and that Dr. Carley had no duty to follow or monitor Mrs. Taylor=s
condition after she stopped seeking treatment from him, we overrule the Taylors= sole
issue on appeal.  Accordingly, we affirm
the trial court=s
judgment.

 

/s/        Kem Thompson Frost

Justice

 

Judgment rendered and
Opinion filed September 28, 2004.

Panel consists of Chief
Justice Hedges and Justices Frost and Guzman.

 

 











[1]  Dr. Carley
appears to have used ADD and ADHD interchangeably in his notes, explaining AADHD is kind of like the vernacular you use which
could include ADD or ADHD.@





[2]  Mrs. Taylor
testified that Dr. Steffek did not run any independent tests on her.  This testimony is consistent with the
interactive nature of Dr. Steffek=s
approach to diagnosis, which involves the patient talking about each of the phenomena
on the printed form rather than having them fill out a checklist.





[3]  Adderall is an
amphetamine.  At the time of Dr. Steffek=s deposition in February 2002, the Federal Drug
Administration had not approved Adderall for adult use.  Dr. Steffek prescribed Adderall instead of
Dexedrine for the patient=s Aultimate convenience,@ because
it has a Alonger therapeutic day.@





[4]  For example,
the January 12, 1999 prescription was for 135 ten-milligrams tablets.  The instructions provided with the
prescription were to take one-and-a-half tablets three times a day, but Dr.
Steffek instructed Mrs. Taylor to begin by taking ten milligrams in the morning
and ten milligrams in the afternoon and build the dose up to twenty milligrams
in the morning and ten in the afternoon. 
Dr. Steffek wrote the prescriptions the way he did Afor the convenience of the patient and through the
exigencies of dealing with the insurance companies who then determine how many
pills a person can use during a month.@





[5]  Mrs. Taylor
testified she never took forty milligrams, but stated she was not sure whether
she took twenty milligrams at 6:00 a.m. and twenty at 1:00 p.m.





[6]  According to
the discharge summary for Mrs. Taylor, she Ahad a
history of adult onset ADD and has been treated with 40 mg of dextroamphetamine
daily for nearly two years.@





[7]  Mrs. Taylor=s husband and her adult son also filed loss of
consortium claims, and Mrs. Taylor and her husband filed loss of consortium
claims on behalf of their four minor children. 





[8]  (footnotes omitted).





[9]  Although the
Taylors raised both misdiagnosis and failure to monitor in the trial court,
their position on appeal is less clear. 
They state, for example, A[Dr.
Carley] owed a duty to Ms. Taylor not to misdiagnose her condition and, arguably,
his duty extended to monitor her progress on the medication and report his
impressions to Dr. Steffek during the course of their joint treatment.@  (Emphasis
added.)  Nevertheless, we address both
the alleged misdiagnosis and the alleged failure to follow.





[10]  In his
summary-judgment motion, Dr. Carley did not allege an absence of evidence to
show Adderall caused the stroke.  Our
review is limited to the grounds asserted. 
See Gold v. City of College Station, 40 S.W.3d 637, 642 n.3 (Tex.
App.CHouston [1st Dist.] 2001, pet granted, judgm=t vacated w.r.m.). 





[11]  In support,
the Taylors cited only Mrs. Taylor=s
deposition in which she described her visits with Dr. Steffek.  There is nothing in the cited deposition
pages to indicate how long Mrs. Taylor was a mutual patient.





[12]  In support,
the Taylors cited Dr. Carley=s deposition in which he testified as follows:

 

Q.  So, before
January 6th, 1999 you did not know she was taking Adderal [sic]?

 

A.  Correct,
until she came and had it with her on that day.

 

Q.  Right,
right.  No one had told you that that was
going to be prescribed to your patient.

 

A.  Not at that time.





[13]  In support,
the Taylors cited the affidavit of Dr. Ron Kimball, Ph.D., in which he opined
that Dr. Carley=s failure Ato
follow proper standards in the assessment, diagnosis and development of a
treatment plan . . . resulted in the misdiagnosis of ADHD, the use of Adderall,
and the development of an amphetamine toxicity that was implicating in a
disabling CVA.@  Dr. Kimball
provided no facts to support the causal connection between the alleged
misdiagnosis and the subsequent events. 
Affidavits containing conclusory statements unsupported by facts are not
competent summary-judgment evidence.  Skelton
v. Comm=n for Lawyer Discipline, 56 S.W.3d 687, 692 (Tex. App.CHouston [14th Dist.] 2001, no pet.).  The Taylors contend by not objecting to Dr.
Kimball=s affidavit, Dr. Carley has waived any objection on
appeal.  An objection regarding the
conclusive nature of an affidavit, however, 
is an objection to the substance of the affidavit that can be raised for
the first time on appeal.  Id.





[14]  As discussed
in note 10, above, in his summary-judgment motion, Dr. Carley did not contend
there was an absence of evidence to show Adderall caused the stroke.





[15]  The Taylors
cited no summary-judgment evidence in support of this contention.